**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **JANET P. GRAF, individually, and** | ) | **CIVIL ACTION NO. 1:12cv2278** |
| **derivatively on behalf of** | ) | |
| **Taylor Lumber Holdings, Inc.,** | ) | **JUDGE DAN AARON POLSTER** |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **VERIFIED FIRST AMENDED** |
| | ) | **COMPLAINT** |
| **RESILIENCE CAPITAL PARTNERS,** | ) | |
| **LLC, et al.,** | ) | **(JURY DEMAND ENDORSED** |
| | ) | **HEREON)** |
| **Defendants.** | ) | |
| | ) | |

Plaintiff Janet P. Graf ("Plaintiff" or "Graf"), for her Verified First Amended
Complaint on her own behalf and derivatively on behalf of Taylor Lumber Holdings, Inc.
("Taylor Holdings" n/k/a WT Hardwoods Group, Inc.) against Defendants Resilience
Capital Partners, LLC ("Resilience"), Ronald J. Cozean ("Cozean"), Bassem A. Mansour
("Mansour"), A. Malachi Mixon ("Mixon") and John Doe Nos. 1-10 (together with
Cozean, Mansour, Mixon, and Resilience, the "Defendants"), states and avers the
following:

**I.     THE PARTIES**

1.     Graf is an individual and citizen of the State of Florida.

2.     Resilience is an Ohio Limited Liability Company.

3.     Upon information and belief, the members of Resilience are citizens of the
State of Ohio.

4. Upon information and belief, Cozean is a citizen of the State of Connecticut.

5. Cozean is Partner in Operations for Resilience and has been with Resilience since 2006.

6. Cozean has been the CEO of WT Hardwoods Group (f/k/a Taylor Lumber Holdings, Inc. and referred to herein as "Taylor Holdings") since July 2010.

7. Cozean was Chief Restructuring Officer for Taylor Lumber, Inc. (referred to herein as "Taylor Lumber") from September 2009 to June 2010.

8. Taylor Lumber was re-structured in June 2010 and became Taylor Holdings.

9. Upon information and belief, Mansour is a citizen of the State of Ohio and is an officer and/or director of Taylor Holdings.

10. Upon information and belief, Mixon is a citizen of the State of Ohio and is an officer and/or director of Taylor Holdings.

11. Taylor Holdings is a Delaware corporation and is a citizen of the State of Delaware.

12. John Doe Nos. 1 through 10 are officers and/or directors of Taylor Holdings who are unknown to Plaintiff at this time.

## II.     JURISDICTION AND VENUE

13. This Court has original jurisdiction over this action under the provisions of 18 U.S.C. § 1331 because this action arises out of Defendants' violations of federal law.

14. This Court has original jurisdiction over this action under the provisions of 28 U.S.C. § 1332 because the matter in controversy exceeds $75,000.00 and is between citizens of different states.

72780490.1

15.     Venue in this judicial district is proper pursuant to 28 U.S.C. §§ 1391(B) because a substantial part of the events or omissions giving rise to the claims herein occurred in this judicial district.

16.     This action is not a collusive one to confer jurisdiction that the Court would otherwise lack.

III.     **FACTUAL BACKGROUND**

17.     This case results from the intentional dilution of Graf's shares in Taylor Holdings and the Defendants' misrepresentations and breaches of fiduciary duties.  The Defendants' improper acts in issuing excessive shares of Taylor Holdings have unfairly and inappropriately diluted Graf's interest in Taylor Holdings and the value of Taylor Holdings.  In addition, and as set forth below, the number of shares issued by Taylor Holdings, relative to the number of shares previously issued and outstanding, and the nominal price per share of the shares so issued, have resulted in an unnecessary and improper dilution of the shares of Taylor Holdings.  Furthermore, Defendants made a number of material misstatements upon which Graf relied in deciding whether to purchase stock in Taylor Holdings.  Now, as a result of Graf's reliance on those misrepresentations, her ownership interest in Taylor Holdings is essentially valueless.

        **A.     The Formation of Taylor Lumber Holdings, Inc.**

18.     Taylor Lumber was established in 1886 as a producer and distributor of hardwood lumber and flooring.

19.     Ms. Graf's deceased husband, Robert Graf, joined Taylor Lumber in 1949 and eventually purchased Taylor Lumber in 1966.

20.     Taylor Lumber was a successful company, but in 2008 it was in covenant default with its lender, PNC Bank, N.A.

- 3 -

21.     Upon Taylor Lumber's default, Ms. Graf took 100% control of the voting stock of Taylor Lumber.

22.     Ms. Graf then entered into discussions with Resilience about possibly re-structuring Taylor Lumber.

23.     Starting in September 2009, Cozean became the Chief Restructuring Officer of Taylor Lumber.

24.     In June 2010, Resilience, through Taylor Lumber Acquisition, Inc., acquired the assets of Taylor Lumber.

25.     In conjunction with Resilience's acquisition of Taylor Lumber via Taylor Lumber Acquisition, Inc., Taylor Lumber Acquisition, Inc. became known as Taylor Lumber Holdings, Inc.

**B.     Defendants Promise Ms. Graf That Her Ownership Interest in Taylor Holdings Will Be Worth At Least $6.5 Million.**

26.     On June 30, 2010, Graf entered into a Stockholders' Agreement with Taylor Holdings (the "Stockholders' Agreement").

27.     A true and accurate copy of the Stockholders' Agreement is attached as Exhibit A.

28.     Graf is a minority stockholder of Taylor Holdings.

29.     Graf would not have entered into the Stockholders' Agreement but for certain misrepresentations made by Defendants prior to the execution of the Stockholders' Agreement.

30.     Prior to entering into the Stockholders' Agreement, Graf engaged in discussions with Defendants regarding her ownership interest in Taylor Lumber and the debt that was owed to her by Taylor Lumber.

- 4 -

31.     At least $6,500,000 was owed to Graf by Taylor Lumber pursuant to a Secured Promissory Note with Cognovit Provision dated February 24, 2005, in the principal amount of $6,500,000.00, and a Secured Promissory Note with Cognovit Provision dated February 24, 2005, in the principal amount of $500,000.00 (collectively, the "Promissory Notes").

32.     A true and accurate copy of the Secured Promissory Note with Cognovit Provision in the principal amount of $6,500,00.00 is attached as Exhibit B and incorporated herein by reference.

33.     Based on her discussions with Defendants, Graf agreed to assign the Promissory Notes to Taylor Holdings as consideration for 25% of the total stock of Taylor Holdings.

34.     A true and accurate copy of the Assignment of Loan and Loan Documents evidencing these assignments is attached as Exhibit C.

35.     In determining whether to assign the Promissory Notes as consideration for 25% of the stock of Taylor Holdings, Graf was primarily concerned, and expressed those concerns to Defendants, about being paid the amount due and owing under the Promissory Notes, which amount was at least $6.5 million.

36.     Defendants stated to Graf that if she assigned the Promissory Notes as consideration for a 25% ownership interest in the stock of Taylor Holdings, her 25% ownership interest in the stock of Taylor Holdings would be worth at least $6.5 million in five to six years.

37.     Specifically, Mixon stated to Graf, on either September 30, 2009 or October 1, 2009, during lunch at the Capital Grille restaurant in Tampa, Florida, that if she assigned the Promissory Notes as consideration for an ownership interest in the

- 5 -

stock of Taylor Holdings, that her ownership interest in Taylor Holdings would be worth at least $6.5 million when Taylor Holdings was sold in five to six years.

38.     Mixon stated to Graf during this discussion that Taylor Holdings would be sold in five to six years (i.e., circa 2014-2015) and that Graf would receive at least $6.5 million from the sale of Taylor Holdings as a result of owning a percentage of the stock of Taylor Holdings.

39.     After this discussion with Ms. Graf, Mixon, Mansour and the other Defendants engaged in further discussions with Ms. Graf's agents, including her daughter, Suzanne Amon, regarding the percentage of ownership interest that would be required for Ms. Graf to receive $6.5 million upon a sale of Taylor Holdings.

40.     The discussions among Ms. Amon and Defendants occurred when Ms. Amon was in Florida and Defendants were in Ohio, after October 1, 2009, from approximately October 2009 through the beginning of 2010.

41.     The Resilience Defendants were aware that Ms. Amon was communicating with Ms. Graf about the negotiations and discussions occurring among Ms. Amon and Defendants.

42.     Defendants informed Ms. Amon that if Ms. Graf owned 25% of the stock of Taylor Holdings, that Ms. Graf's 25% ownership interest would be worth at least $6.5 million when Taylor Holdings was sold in 5-6 years.

43.     Ms. Amon relayed all of this information to Ms. Graf.

44.     Ms. Graf decided, based on Defendants' representations, to relinquish control of Taylor Lumber, to forgive the debt owed under the Promissory Notes in consideration for owning 25% of the stock of Taylor Holdings, and to permit Defendants to re-structure Taylor Lumber.

- 6 -

45.     Ms. Graf made these decisions based on the representations of Defendants, and in particular Mixon and Mansour, that 25% of the stock of Taylor Holdings would be worth at least $6.5 million when Taylor Holdings was sold.

46.     Mixon and Mansour knew when they made these representations to Graf that Graf's 25% ownership interest in Taylor Holdings would never be worth $6.5 million.

47.     Mixon and Mansour knew that a 25% ownership interest in Taylor Holdings would never be worth $6.5 million, in part, because Taylor Holdings would have to sell for at least $26 million around 2014-2015.  Mixon and Mansour knew that Taylor Holdings, a company Defendants have alleged was "a distressed business" that "struggled" financially starting in the fall of 2009, would not be worth $26 million in 2014-2015.

48.     Indeed, Defendants have alleged that Taylor Lumber began experiencing financial difficulty as early as 2008.

49.     Mixon and Mansour knew that Graf's 25% ownership interest in Taylor Holdings would never be worth $6.5 million because in September and October of 2009 and after Taylor Lumber was experiencing financial difficulty.

50.     Graf relied on Defendants', and in particular Mixon's and Mansour's representations, in deciding to purchase the stock of Taylor Holdings by assigning the Promissory Notes as consideration for a 25% ownership interest in Taylor Holdings.

51.     Graf relied on Defendants' representations and would not have assigned the Promissory Notes to Taylor Holdings as consideration for a 25% ownership interest in Taylor Holdings, but for Defendants' misrepresentations.

72780490.1

52.     Defendants' misrepresentations, and in particular Mixon's and Mansour's misrepresentations, were material misstatements made in connection with Graf's purchase of a security, i.e., the stock of Taylor Holdings.

53.     During her discussions with Defendants, including Mixon, Graf informed Defendants that if she was not going to receive the $6.5 million owed to her until the sale of Taylor Holdings in five to six years, then she needed a form of income until that time.

54.     Defendants therefore agreed to enter into a Consulting Agreement with Graf.

55.     As a result, on June 30, 2010, Graf executed a Consulting Agreement (the "Consulting Agreement") with Taylor Lumber Acquisition, Inc.

56.     A true and accurate copy of the Consulting Agreement is attached as Exhibit D.

57.     Pursuant to the Consulting Agreement, Taylor Lumber Acquisition, Inc. is required to pay Graf a fee of One Hundred Eighty Thousand Dollars ($180,000.00) annually.

**C.     The Issuance of Excessive Shares and Intentional Dilution of Graf's Shares**

58.     On December 30, 2011, Taylor Holdings purchased the assets of Weaber, Inc. ("Weaber").

59.     Weaber is a producer of hardwood lumber.

60.     In connection with Taylor Holdings' purchase of Weaber, Defendants invested funds in Taylor to fund the purchase of Weaber, and Taylor Holdings then issued shares as consideration for the investment of those funds.

- 8 -

61.     Specifically, the shares issued by Taylor Holdings (hereinafter, the "Issuance") are as follows: (i) 84,903,300 shares of its Class A Voting Common Stock, par value $0.001 per share ("Common Stock"), and 339,613,200 shares of its non-voting Preferred Stock, par value $0.001 per share ("Preferred Stock") to The Resilience Fund III, L.P.; and (ii) 15,096,700 shares of Common Stock and 60,386,800 shares of Preferred Stock to The Resilience Fund III (PF), L.P., in each case at a purchase price of $0.01 per share of Common Stock and $0.01 per share of Preferred Stock for an aggregate price of $5,000,000.00.

62.     The Issuance occurred on December 30, 2011.

63.     The Resilience Fund III, L.P. and The Resilience Fund III (PF), L.P. (the "Resilience Entities") are entities related to, controlled by, and/or affiliated with Resilience.

64.     Defendants have control over Taylor Holdings.

65.     Resilience is the controlling stockholder of Taylor Holdings.

66.     Upon information and belief, Resilience owns more than 50% of Taylor Holdings.

67.     Upon information and belief, Defendants exercise control over the business and affairs of Taylor Holdings.

68.     Defendants have knowledge of Taylor Holdings' operations, financial statements, and performance.

69.     Upon information and belief, the Resilience Defendants set the per share purchase price of the Issuance and approved the Issuance.

70.     Pursuant to Section 9.1 of the Stockholders' Agreement, Graf was permitted to purchase her pro rata share of the Issuance (the "Anti-Dilution Option").

71.     A true and accurate copy of the letter sent by Taylor Holdings to Graf, informing Graf of the Anti-Dilution Option, is attached as Exhibit E.

72.     As explained above, prior to and at the time of the Issuance, Graf owned 25% of the total shares of Taylor Holdings.

73.     Graf elected to not exercise the Anti-Dilution Option.

74.     If Graf had elected to exercise the Anti-Dilution Option, she would have had to pay in excess of $1 million in order to maintain her 25% ownership interest in Taylor Holdings.

75.     Graf elected to not exercise the Anti-Dilution Option based, in part, on certain representations made by Mixon to Ms. Graf's agent, Larry Amon.

76.     Specifically, on January 11, 2012, Mr. Amon spoke with Mixon over the telephone about the Anti-Dilution Option, the purchase of Weaber, and the value of Taylor Holdings.

77.     During this conversation, which occurred when Mr. Amon was in Florida and Mixon was in Ohio, Mixon stated to Mr. Amon that Taylor Holdings was a worthless company.

78.     Mixon was aware that Mr. Amon was acting on behalf of Ms. Graf.

79.     Mr. Amon informed Ms. Graf of Mixon's statements.

80.     Mixon's statement that Taylor Holdings was a worthless company was a material statement upon which Graf relied in determining whether to exercise the Anti-Dilution Option.

81.     Taylor Holdings was not a worthless company, as evidenced, in part, by the valuation report dated August 1, 2013 prepared by BBP Partners in connection with this action.

72780490.1

82.     Taylor Holdings was not a worthless company, as evidenced, in part, by the fact that Defendants were able to obtain a loan, using Taylor Holdings as collateral, to fund part of the purchase price of Weaber.

83.     Mixon was aware of the falsity of his statement that Taylor Holdings was a worthless company, because at or around the time he made this statement to Mr. Amon, Taylor Holdings was being used as collateral for a loan issued to purchase Weaber.  Thus, Defendants and Mixon were aware that Taylor Holdings had value.

84.     Mixon was aware of the falsity of his statement that Taylor Holdings was a worthless company, because he is familiar with Taylor Holdings' financial statements, operations, performance, and value, as a partner of Resilience, which controls Taylor Holdings.

85.     As a result of the Issuance, the percentage of shares of Taylor Holdings owned by Graf was diluted from 25% to 0.00312%.

86.     Graf now owns 0.00312% of the total shares of Taylor Holdings.

87.     The number of shares issued by Taylor Holdings, relative to the number of shares previously issued and outstanding, and the nominal price per share of the shares so issued, have severely diluted Graf's interest in Taylor Holdings.

88.     The number of shares issued by Taylor Holdings, relative to the number of shares previously issued and outstanding, and the nominal price per share of the shares so issued, have severely diluted the value of Taylor Holdings.

89.     The Issuance of so many shares at such a nominal price per share is the functional equivalent of causing Taylor Holdings to be valued as worthless.

90.     Defendants failed to perform a valuation of Taylor Holdings prior to the Issuance.

72780490.1

91.     Upon information and believe, Defendants failed to perform a valuation of Weaber prior to the Issuance.

92.     Defendants had no basis for valuing the Common Stock at $0.001 and $0.01 and the Preferred Stock at $0.001 and $0.01.

93.     If Defendants had conducted a valuation of Taylor Holdings prior to the Issuance, or had conducted some due diligence as to the value of Taylor Holdings, Defendants would not have approved of the Issuance and would not have issued such an excessive number of shares at such a nominal price.

94.     If Defendants had conducted a valuation of Taylor Holdings prior to the Issuance, or had conducted some due diligence as to the value of Weaber when compared to Taylor Holdings, Defendants would not have approved of the Issuance and would not have issued such an excessive number of shares at such a nominal price.

95.     Defendants purchased Weaber for approximately $18 million.

96.     After, or at the time Weaber was purchased, Weaber and Taylor Holdings were combined.

97.     At the time of Defendants' purchase of Weaber, Taylor Holdings was a more profitable company than Weaber.

98.     If Taylor Holdings were truly valueless, as Defendants have represented, Defendants would not have paid approximately $18 million for Weaber – a company that was less profitable than Taylor Holdings.

99.     If Taylor Holdings were truly valueless, as Defendants have represented, Defendants should have considered liquidating the assets of Taylor Holdings in order to maximize stockholder value.

72780490.1

100.    Upon information and belief, Defendants failed to consider liquidation of the assets of Taylor Holdings.

101.    Taylor Holdings' financial statements, which were prepared by Defendants, reflect a net asset value of Taylor Holdings in excess of $4 million.

102.    Defendants caused Taylor Holdings to issue shares to the Resilience Entities at the expense of Graf and Taylor Holdings.

103.    Defendants breached their fiduciary duties to Taylor Holdings and Graf by approving the Issuance without first obtaining a valuation of Taylor Holdings and Weaber and/or without properly valuing Taylor Holdings and Weaber for the purpose of the Issuance and/or without conducting proper due diligence as to the combined value of Taylor Holdings and Weaber.

104.    The price per share of the Issuance of shares was made in a completely arbitrary fashion by Defendants in order to intentionally dilute the ownership interest of Graf and for the benefit of Defendants.

105.    Taylor Holdings received inadequate payment for the shares issued pursuant to the Issuance.

106.    The worthless value applied to Taylor Holdings by Defendants benefited Defendants by increasing Resilience's ownership interest in Taylor Holdings and by reducing Graf's interest in Taylor Holdings.

107.    Resilience, through the Resilience Entities, received the benefit of an increased ownership interest in Taylor Holdings at the expense of Graf and Taylor Holdings.

108.    Graf's ownership interest in Taylor Holdings decreased as a result of the Issuance and resulting increase in Resilience's ownership in Taylor Holdings.

- 13 -

109.    If Taylor and Weaber had been fairly and properly valued by Defendants, Graf's analysis of whether to exercise her rights pursuant to the Anti-Dilution Option would have been materially different.

110.    If Defendants, and Mixon, had not made misrepresentations regarding the value of Taylor Holdings, Graf's analysis of whether to exercise her rights pursuant to the Anti-Dilution Option would have been materially different.

111.    On April 5, 2012, Graf, through counsel, demanded by letter (the "April 5, 2012 Correspondence") that an independent, third-party valuation of Taylor Holdings be performed so that the shares subject to the Anti-Dilution Option could be properly valued and so that Graf could appropriately consider whether to exercise the Anti-Dilution Option under the appropriate circumstances.

112.    A true and accurate copy of the April 5, 2012 Correspondence is attached as Exhibit F.

113.    In the April 5, 2012 Correspondence, Graf also demanded that an independent, third-party intermediary be retained to explore potential strategic alternatives for Taylor Holdings in an effort to maximize its value for its stockholders.

114.    Resilience refused to conduct an independent third-party valuation of Taylor Holdings and refused to explore potential strategic alternatives.

115.    Demanding that the Board of Directors of Taylor Holdings (the "Board of Directors") bring suit for dilution of Taylor Holdings' shares and Graf's shares would have been futile.

116.    The Board of Directors could not have made an unbiased, independent business decision about whether it would have been in Taylor Holdings' best interests to bring a lawsuit, because the Board of Directors is partially, if not completely, comprised

- 14 -

of officers and/or partners of Resilience, including, upon information and belief, Cozean, Mansour, and Mixon.

117.    Indeed, Cozean, Mansour, and Mixon are partners at Resilience, and Mansour is the Managing Partner of Resilience.

118.    Upon information and belief, and based on their connections to Resilience, Cozean, Mansour, and Mixon received economic and career benefits as a result of the Issuance.

119.    Based on their connections to Resilience, Cozean, Mansour, and Mixon are incapable of making an impartial decision regarding litigation.

120.    Graf justifiably relied on Mixon's statements in deciding to not exercise the Anti-Dilution Option.

121.    As an owner of 0.00312% of the total shares of Taylor Holdings, Graf will never receive $6.5 million in the event Taylor Holdings is sold, as promised by Mixon.

122.    In order for Graf's 0.00312% ownership interest in the total stock of Taylor Holdings to yield a value of $6.5 million upon sale, Taylor Holdings would need to sell for an amount in excess of $2 billion.

123.    Graf discovered that Mixon's representations were false and that she would never receive $6.5 million during the course of this lawsuit.

## COUNT ONE
### (Breach of Fiduciary Duty of Loyalty and Good Faith)

124.    Graf hereby incorporates each and every paragraph set forth above as if fully re-written herein.

- 15 -

125.    Defendants had a fiduciary duty of loyalty to Graf and Taylor Holdings to, among other things, maximize stockholder value and to act in the best interests of Graf and Taylor Holdings.

126.    Defendants knew that the Issuance would result in a dilution of the value of Taylor Holdings.

127.    Defendants knew that the Issuance would result in a dilution of Graf's stock interest and an increase in Resilience's ownership interest in Taylor Holdings.

128.    Defendants knew that the Issuance would result in an increase in Resilience's ownership interest in Taylor Holdings through the Resilience Entities.

129.    By failing to conduct a proper valuation of Taylor Holdings and Weaber prior to the Issuance, Defendants received a personal benefit of increased ownership in and control of Taylor Holdings that was not shared by Graf.

130.    By not conducting a proper valuation of Taylor Holdings and Weaber prior to the Issuance, Defendants breached their fiduciary duties of loyalty to Taylor Holdings and Graf by not considering the impact of the Issuance and by receiving an increased ownership interest in Taylor Holdings.

131.    Defendants dictated the terms of the Issuance in that they orchestrated the purchase of Weaber, established the prices of the Common Stock and the Preferred Stock, and did so without conducting a proper analysis as to those prices.

132.    Defendants failed to perform a proper valuation of Taylor Holdings and Weaber, failed to consider an appropriate value of the shares prior to the Issuance, and had no basis for valuing the Common Stock and the Preferred Stock as they did.

72780490.1

133.    If Defendants had conducted a valuation of Taylor Holdings and Weaber prior to the Issuance, Defendants would not have issued such an excessive number of shares at such a nominal price.

134.    Defendants breached their duty of loyalty, and corresponding duty of good faith, by advancing their own interests in obtaining increased ownership interests in Taylor Holdings and by purposely diluting Graf's ownership interest in Taylor Holdings.

135.    Defendants breached their duty of loyalty, and corresponding duty of good faith, by advancing their own interests in obtaining increased ownership interests in Taylor Holdings and by purposely diluting the value of Taylor Holdings.

136.    Defendants breached their duty of loyalty, and corresponding duty of good faith, by failing to conduct a valuation of Taylor Holdings and Weaber prior to the Issuance, by failing to consider and evaluate an appropriate price of the shares issued in the Issuance, and by failing to maximize stockholder value.

137.    Had Defendants acted in the best interests of Taylor Holdings and Graf, they would have conducted a valuation of Taylor Holdings and Weaber prior to the Issuance and they would have considered the value of the shares of the combined Taylor Holdings and Weaber entity.

138.    As a result of the actions and omissions of Defendants, Graf's interest in Taylor Holdings has been severely diluted.

139.    As a result of the actions and omissions of Defendants, Taylor Holdings' shares and value have been improperly diluted.

72780490.1

## COUNT TWO
### (Breach of Fiduciary Duty of Care)

140.   Graf hereby incorporates each and every paragraph set forth above as if fully re-written herein.

141.   Defendants owed a fiduciary duty of due care to Graf and Taylor Holdings to act on an informed basis.

142.   Defendants failed to perform a proper valuation of Taylor Holdings and Weaber prior to the Issuance and had no basis for valuing the Common Stock and the Preferred Stock as they did.

143.   Prior to the Issuance, Defendants failed to perform any analysis and failed to conduct any due diligence regarding the value of Taylor Holdings and Weaber.

144.   If Defendants had conducted a valuation of Taylor Holdings and Weaber prior to the Issuance, the Resilience Defendants would not have issued such an excessive number of shares at such a nominal price.

145.   By failing to give any consideration to the value of Taylor Holdings and Weaber prior to the Issuance, Defendants breached the duty of care owed to Taylor Holdings and Graf.

146.   As a result of the actions and omissions of Defendants, Graf's interest in Taylor Holdings has been diluted.

147.   As a result of the actions and omissions of Defendants, Taylor Holdings' shares and value have been diluted.

72780490.1

## COUNT THREE
### (Violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 Promulgated Thereunder)

148.   Graf hereby incorporates each and every paragraph set forth above as if fully re-written herein.

149.   Defendants made material misrepresentations to Graf regarding the value of her ownership interest in Taylor Holdings and the value of Taylor Holdings.

150.   Specifically, Mixon and Mansour represented to Graf that Taylor Holdings would be sold around 2014-2015, and that as a result of this sale, Graf would receive $6.5 million based on her 25% ownership interest in Taylor Holdings.

151.   Based on these representations, Graf agreed to purchase 25% of the stock of Taylor Holdings by assigning the Promissory Notes as consideration.

152.   Graf relied on Defendants' statements to her detriment because her 25% ownership interest was intentionally diluted to 0.00312%.

153.   Graf relied on Defendants' statements to her detriment because her ownership interest in Taylor is not and will never be worth $6.5 million.

154.   Defendants' representations were made in connection with Ms. Graf's purchase of securities, i.e., the stock of Taylor Holdings.

155.   Defendants' representations were material in that Graf would not have entered into the Stockholders' Agreement and would not have purchased the shares of Taylor Holdings if she knew she would never receive $6.5 million as promised by Mixon.

156.   Defendants' representations were material because Graf would not have relinquished 100% of the control of Taylor Lumber, and would not have consented to the restructuring of Taylor Lumber, but for Defendants' representations that she would receive $6.5 million upon the sale of Taylor Holdings.

72780490.1

157.   Defendants knew that Graf's ownership interest in Taylor Holdings would never be worth $6.5 million.

158.   Defendants made these misrepresentations to Graf in order to convince her to relinquish control of Taylor Lumber.

159.   Defendants made these misrepresentations to Graf in order to convince her to forgive the debt owed to her by Taylor Lumber.

160.   Graf has been damaged by Defendants' representations because her 0.00312% ownership interest in Taylor is not worth $6.5 million and will never be worth $6.5 million.

161.   Defendants made further misrepresentations to Graf in connection with the sale of securities when they represented, after the Issuance, that the value of Taylor Holdings was zero.

162.   Specifically, Mixon represented to Graf that Taylor Holdings was a worthless company.

163.   Taylor Holdings was not a worthless company at the time of the Issuance and Mixon was aware that Taylor Holdings was not a worthless company when he made these representations.

164.   Taylor Holdings' financial statements at the time of the Issuance, of which Defendants are and were familiar, reflect that Taylor Holdings had value at and around the time of the Issuance.

165.   Graf relied on Defendants' and Mixon's misrepresentations in deciding to not purchase additional securities, i.e., the shares of Taylor Holdings, and in deciding to not exercise the Anti-Dilution Option.

- 20 -

166.   Graf did not have access to and was not provided with appropriate financial information related to Taylor Holdings and Weaber when deciding whether to exercise the Anti-Dilution Option.

167.   Had Graf been provided with accurate information regarding the value of Taylor Holdings and Weaber when deciding whether to exercise the Anti-Dilution Option, her decision to exercise the Anti-Dilution Option would have been different.

168.   As a result of being provided false and incomplete information regarding the value of Taylor Holdings, Graf was damaged by not exercising the Anti-Dilution Option.

169.   As a result of Defendants' misrepresentations, Graf has suffered damages.

## COUNT FOUR
### (Violations of Section 20(a) of the Securities and Exchange Act of 1934)

170.   Graf hereby incorporates each and every paragraph set forth above as if fully re-written herein.

171.   All Defendants are jointly and severally liable for the misrepresentations made by Mixon and Mansour in connection with the purchase and sale of the stock of Taylor Holdings because they exercise control over Mixon and Mansour.

172.   Defendants exercise control over Mixon and Mansour by virtue of the fact that they are partners with Mixon and Mansour, because Mixon and Mansour are partners in Resilience, and because Mansour is the Managing Partner of Resilience.

173.   As controlling persons, Defendants are liable under Section 20(a) of the Securities Exchange Act of 1934 for the violations of Section 10(b) of the Securities and Exchange Act of 1934 and Rule 10b-5 committed by Mansour and Mixon.

## COUNT FIVE
### (Fraud Under Ohio Common Law)

174.    Graf hereby incorporates each and every paragraph set forth above as if fully re-written herein.

175.    Defendants made false statements to Ms. Graf regarding the value of Taylor Holdings and the value of her 25% ownership interest in Taylor Holdings.

176.    Specifically, Mixon and Mansour represented to Graf that if she entered into the Stockholders' Agreement, forgave the debt owed to her by Taylor Lumber, and agreed to re-structure Taylor Lumber, all in exchange for owning 25% of Taylor Holdings, that her ownership interest in Taylor Holdings would be worth $6.5 million.

177.    Ms. Graf's ownership interest in Taylor Holdings is not worth $6.5 million and will never be worth $6.5 million.

178.    Defendants were aware when they made these representations to Ms. Graf that her ownership interest in Taylor Holdings would never be worth $6.5 million.

179.    Defendants made these representations to Ms. Graf with the intent of misleading her and with the intent of having her rely on these representations.

180.    Defendants made these representations so that Ms. Graf would relinquish control of Taylor Lumber and so that Defendants could then take control and own Taylor Holdings and make a profit.

181.    Ms. Graf justifiably relied on Defendants' representations in deciding to relinquish control of Taylor Lumber, sign the Stockholders' Agreement, and forgive the debt owed to her by Taylor Lumber.

182.    Ms. Graf agreed to the foregoing because Defendants promised that she would receive $6.5 million.

72780490.1

183.    If Defendants had not made the foregoing representations, Graf would not have relinquished control of Taylor Lumber, would not signed the Stockholders' Agreement, and would not have forgiven the debt owed to her by Taylor Lumber.

184.    Graf has been damaged by Defendants' representations because Graf's ownership interest in Taylor Holding is essentially worthless and because she will never receive $6.5 million as promised.

WHEREFORE, Plaintiff Janet P. Graf, on behalf of herself individually and derivatively on behalf of Taylor Lumber Holdings, Inc., prays for judgment as follows:

(1)    For money damages against all Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein; and

(2)    For rescission of the Issuance and rescission of the purchase of Weaber; and

(3)    That the value of any shares issued by Taylor Lumber Holdings, Inc. be based on a fair valuation of Taylor Lumber Holdings, Inc. and a fair valuation of Weaber, Inc.; and

(4)    For all Defendants to account for all damages caused by them and all profits and special benefits they have obtained as a result of their unlawful conduct;

(5)    For all damages and interest due and owing as a result of Defendants' fraudulent misrepresentations; and

(6)    For punitive damages, attorneys' fees, expert fees, and the costs incurred in bringing this action; and

(7)    For all other relief as this Court may deem just and proper.

- 23 -

72780490.1

## JURY DEMAND

Graf demands a trial by jury as to all issues so triable.

Respectfully submitted,

*/s/ Julie A. Crocker*
Julie A. Crocker (0081231)
*jcrocker@taftlaw.com*
TAFT STETTINIUS & HOLLISTER LLP
200 Public Square, Suite 3500
Cleveland, OH  44114-2302
Phone: (216) 241-2838
Fax: (216) 241-3707

Attorney for Plaintiff Janet Graf

- 24 -

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 31, 2013, the foregoing was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

<u>*/s/ Julie A. Crocker*</u>
Attorney for Plaintiff Janet P. Graf

- 25 -

72780490.1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JANET P. GRAF, | ) | CASE NO. 1:12-CV-02278 |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | JUDGE DAN AARON POLSTER |
| | ) | |
| RESILIENCE CAPITAL PARTNERS, | ) | |
| LLC, et al., | ) | VERIFICATION TO |
| | ) | FIRST AMENDED COMPLAINT |
| Defendants. | ) | |
| | ) | |
| | ) | |

## DECLARATION OF JANET P. GRAF

In accordance with 28 U.S.C. § 1746, I, Janet P. Graf, declare as follows:

1.     I reviewed the First Amended Complaint filed in this matter and authorized its filing.

2.     I reviewed the allegations made in the First Amended Complaint and as to those allegations of which I have personal knowledge, I believe those allegations to be true.  As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation.

3.     I further declare that I am a current stockholder of Taylor Lumber Holdings, Inc.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 22, 2012.

Janet P. Graf

72793212.1

# EXHIBIT A

## STOCKHOLDERS' AGREEMENT

THIS STOCKHOLDERS' AGREEMENT is entered into as of the 30th day of June, 2010, by and among TAYLOR LUMBER HOLDINGS, INC., a Delaware corporation (hereinafter referred to as the "Company"), each of the persons listed in Exhibit A hereto, and each other Person hereafter becoming a party to this Agreement in accordance with the terms hereof or otherwise.

## RECITALS:

A.     The Company and the Stockholders desire to grant certain rights and to impose certain restrictions relating to the transfer of the Shares of the Company owned by the Stockholders in order to advance the Company's welfare and the prospects for its success, to ensure unity and continuity of control in the ownership and management of the Company for the benefit of the Company and its future business activities, as well as to establish certain orderly procedures for the transfer of the Shares of the Company as a means of resolving potential disputes among the Stockholders and avoiding other disruptions of the Company's affairs.

In consideration of the foregoing premises and mutual covenants contained herein, the parties hereby agree that all of the Shares shall be held subject to the provisions hereinafter set forth.

## ARTICLE 1. DEFINITIONS

When used in this Agreement, the following terms in all of their tenses, cases and correlative forms shall have the meanings assigned to them in this Article 1 or elsewhere in as indicated in this Article 1:

An "Affiliate" of a specified Person means any other Person which, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with such specified Person. For purposes of this definition, "control" of any Person means possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting capital stock, by contract, or otherwise.

"Agreement" means this Stockholders' Agreement, as the same may be amended from time to time.

"Agreement Terms" are the terms supplied by Article 10 hereof.

"Anti-Dilution Option" and "Anti-Dilution Optionee" are defined in Section 9.1.

"Article 3 Transaction" is defined in Section 6.2.

Exhibit A

31488.0003 / 1834617v7

"Board of Directors" means the Board of Directors of the Company.

"Book Value Price" means the price per Share as determined in accordance with the provisions of Exhibit C hereto.

"Call Option" and "Call Option Securities" are defined in Section 4.1.

"Call Option Notice" is defined in Section 4.2.

Termination with "Cause," in the case of an Employed Security Holder or Consultant Security Holder who is then a party to a written employment contract or consulting contract with the Company or one or more Subsidiaries, or a written stock option agreement with the Company or one or more Subsidiaries, in which the circumstances of a termination with "Cause" or the like are defined, shall for purposes of this Agreement mean a termination of such employment or engagement under any such defined circumstance in such employment or consulting contract or such stock option agreement, provided that if such Employed Security Holder or Consultant Security Holder is a party to both a written employment or consulting contract and a stock option agreement, "Cause" shall for purposes of this Agreement have the meaning set forth in such employment or consulting contract and not in such stock option agreement. In the case of an Employed Security Holder or Consultant Security Holder who is not then a party to an employment or consulting contract or a stock option agreement in which the circumstances of a termination of employment or the engagement with "Cause" or the like are defined, termination of employment or the engagement with "Cause" shall mean, for purposes of this Agreement, a termination of such employment or engagement by the Company or its Subsidiaries on account of (i) any fraud, misappropriation or embezzlement by such Employed Security Holder or Consultant Security Holder in connection with the business of the Company or any Subsidiary; (ii) any act of gross negligence, gross corporate waste or disloyalty by such Employed Security Holder or Consultant Security Holder with respect to, or the commission of any intentional tort by such Employed Security Holder or Consultant Security Holder against, the Company or any Subsidiary; (iii) any conviction of or *nolo contendere* plea to a felony or a gross misdemeanor by such Employed Security Holder or Consultant Security Holder that has or can reasonably be expected to have a detrimental effect on the Company or any Subsidiary; (iv) repeated absenteeism, illegal drug use or excessive alcohol consumption by such Employed Security Holder or

2

Consultant Security Holder (other than medical leave, disability leave or other approved absence); (v) any gross neglect or persistent neglect by such Employed Security Holder or Consultant Security Holder to perform the duties assigned to him by the Board of Directors or any designee to whom he reports, provided that the Employed Security Holder or Consultant Security Holder shall first have received a written notice from the Company which sets forth in reasonable detail the manner in which he has grossly or persistently neglected such duties and he shall have failed to cure the same within a period of 10 days after such notice is given, unless the same cannot reasonably be cured within said 10-day period, in which event the Employed Security Holder or Consultant Security Holder shall have up to an additional 30 days to cure the same so long as he is diligently seeking to cure the same, and provided, further, that the Company shall not be required to give written notice of, nor shall the Employed Security Holder or Consultant Security Holder have a period to cure, the same or any similar gross neglect or persistent neglect as to which the Company shall have previously given written notice to the Employed Security Holder or Consultant Security Holder and which he shall have previously cured; or (vi) any public conduct of such Employed Security Holder or Consultant Security Holder that has or can reasonably be expected to have a detrimental effect on the Company or any Subsidiary. For purposes of this Agreement, termination with "Cause" shall also mean any voluntary resignation or other termination of employment or engagement effected by any Employed Security Holder or Consultant Security Holder under circumstances in which the employer could effect such termination with Cause pursuant to the two preceding sentences.

"Code" means the United States Internal Revenue Code of 1986, as amended, or any successor statute thereto, and the regulations promulgated thereunder.

"Company" is defined in the introductory paragraph.

"Company Option" is defined in Subsection 3.2.1.

"Consultant Security Holder" means, at any time, an individual Stockholder: (i) who is then engaged as a consultant to the Company or of one or more Subsidiaries, whether or not pursuant to a written agreement relating to such engagement; and (ii) and who owns Shares.

"Co-Sale Notice" is defined in Section 7.2.

3

"Co-Sale Percentage" is defined in Section 7.3.

"Co-Sale Purchasers" is defined in Section 7.1.

"Co-Sale Right" is defined in Section 7.3.

"Delayed Coinvestment" means a sale of Shares by any Resilience Stockholder to an third party institutional investor or to a third party financial institution providing financing in connection with the acquisition of the Company (or to an Affiliate of such an institutional investor or financial institution), in any such case, that is consummated within 12 months after the date hereof, provided that the aggregate amount of all Delayed Coinvestments cannot exceed $500,000.

"Dilution Notice" is defined in Section 9.1.

"Disability," in the case of an Employed Security Holder who is then a party to a written contract of Employment with the Company or one or more Subsidiaries in which such term or a substantially similar term is defined, shall have the same meaning herein as is defined in such contract of Employment. In the case of an Employed Security Holder who is not then a party to such a contract, "Disability" shall mean any physical or mental impairment (a) because of which an Employed Security Holder does not perform his duties of his Employment for a period of at least 120 consecutive days or for 180 days during any 12-month period; or (b) which, in the judgment of the Board of Directors (such judgment to be made on the basis of a written certification by a physician acceptable to the Board of Directors), renders the Employed Security Holder incapable of performing the duties of his Employment. For purposes hereof, each Employed Security Holder agrees to submit to a reasonable number of examinations by the physician making the determination of a disability hereunder, and the Employed Security Holder hereby authorizes the disclosure and release to the Company of such determination and all supporting medical records. If the Employed Security Holder is not legally competent, the Employed Security Holder's legal guardian or duly authorized attorney-in-fact will act in the Employed Security Holder's stead for purposes of submitting the Employed Security Holder to the examinations, and providing the authorization of disclosure required hereunder.

"Drag-Along Notice" is defined in Section 8.2.

"Drag-Along Percentage" is defined in Section 8.1.

"Drag-Along Purchasers" is defined in Section 8.1.

4

"Drag-Along Right" is defined in Section 8.1.

"Drag-Along Shares" is defined in Section 8.1.

"Employed Security Holder" means, at any time, an individual Stockholder: (i) who is then a full-time employee of the Company or of one or more Subsidiaries, whether or not pursuant to a written agreement relating to such employment; and (ii) and who owns Shares.

"Exempt Transfer" as applied to any Resilience Stockholder means: (a) any Transfer of Resilience Shares by such Resilience Stockholder, including pursuant to any Delayed Coinvestment (but excluding those of the kind referred to in clause (b) of this definition), provided that, after giving effect to such Transfer and all prior Transfers, including pursuant to any Delayed Coinvestment (but excluding those of the kind referred to in clause (b) of this definition), (i) not more than twenty-five percent (25%) of the aggregate number of Shares owned by (and issuable to) the Resilience Entities or their respective Affiliates on the date of this Agreement (adjusted appropriately for stock dividends, stock splits, combinations and the like) shall have been Transferred pursuant to this clause (a) and (ii) the Resilience Entities together with their respective Affiliates continue to own at least 51% of the outstanding equity and voting rights of the Company; and (b) any Transfer to any Affiliate of a Resilience Entity.

"FMV Price" means the price per Share as determined in accordance with the provisions of Exhibit D hereto.

Termination with "Good Reason," in the case of an Employed Security Holder who is then a party to a written contract of Employment with the Company or one or more Subsidiaries, or a written stock option agreement with the Company or one or more Subsidiaries, in which the circumstances of a termination with "Good Reason" are defined, shall for purposes of this Agreement mean a termination of such Employment under any such defined circumstance in such contract of Employment or such stock option agreement, provided that if such Employed Security Holder is a party to both a written contract of Employment and a stock option agreement, "Good Reason" shall for purposes of this Agreement have the meaning set forth in such contract of Employment and not in such stock option agreement. In the case of an Employed Security Holder who is not then a party to a contract of Employment or a stock option agreement in which the circumstances of a termination of Employment with "Good Reason" are defined, termination of Employment with "Good

5

Reason" shall mean, for purposes of this Agreement, a termination of such Employment by such Employed Security Holder on account of a requirement that he or she be required to be based in a geographical area materially different than his or her current location; provided, however, that this provision shall not be construed to alter the at-will employment status of any such Employee Security Holder as further provided in Section 14.4.

"Graf" means Janet P. Graf.

"Institutional Stockholders' Agreement" means any stockholders' agreement entered into between the Company, Resilience Entities and the institutions who are investors in the Company.

"Issuance" is defined in Section 9.1.

"Listed Security Holder" means a Stockholder who or which is listed in Exhibit A; provided, however, that in the case of any Stockholder listed in Exhibit A who is an individual, such individual shall cease to be a "Listed Security Holder" at such time as no Shares are held by either him or by any Person to whom he has previously Transferred any Shares pursuant to Section 2.7.1(a). Section 14.2 hereof notwithstanding, the Company may amend Exhibit from time to time by adding Stockholders thereto, or by removing therefrom individuals who cease to be "Listed Security Holders" by operation of the preceding sentence.

A "Non-Resilience Stockholder" means any Stockholder who or which is not a Resilience Stockholder.

"Offered Securities" is defined in Section 3.1.

"Option" means any right granted or issued by the Company to any Person to cause the Company to issue Shares to any Person, and includes, without limitation, any warrants, any stock options (whether held by employees of the Company or by other Persons), any debt obligation or preferred stock which is convertible into Shares, and any other similar right, in each case to the extent such right has not been exercised as of the time to which reference is made.

"Permitted Transferee" means a transferee of Shares in a Transfer that is permitted by the terms of Section 2.7.1(a).

"Person" means an individual, a corporation, a limited liability company, an association, a joint-stock company, a business trust or other similar organization, a partnership, a joint venture, a trust, an

6

unincorporated organization, a government or any agency, instrumentality or political subdivision of a government.

"Resilience" means Resilience Capital Partners, LLC, a Delaware limited liability company, and its successors and assigns.

"Resilience Entities" means the collective reference to Resilience and The Resilience Fund II Annex, L.P., a Delaware limited partnership, and each of their respective successors and assigns.

"Resilience Optionees" is defined in Section 3.3.1.

"Resilience Stockholder" means (i) each of the Resilience Entities who hold any Shares; (ii) each Affiliate of any of the Resilience Entities, which Affiliate holds any Shares; and (iii) each of their respective successors and assigns who shall have agreed in writing to become a "Resilience Stockholder" hereunder.

"Resilience Shares" as applied to any Resilience Stockholder, means all Shares owned by such Resilience Stockholder and all securities convertible into or exercisable or exchangeable, directly or indirectly, for Shares.

"Restrictive Covenants" is defined in Section 7.3.

"Retirement," in the case of an Employed Security Holder who is then a party to a written contract of employment with the Company or one or more Subsidiaries, or a stock option agreement with the Company or one or more Subsidiaries, in which such term or a substantially similar term is defined, shall have the same meaning for purposes of this Agreement as is defined in such contract of employment or stock option agreement. In the case of an Employed Security Holder who is not then a party to such a contract, "Retirement" means, solely for purposes of this Agreement, the termination by such Employed Security Holder of his Employment upon or after his attainment of age sixty-five (65), or such lesser age as the Board of Directors may approve.

"Sale of the Company" is defined in Section 6.1.

"Secondary Option" is defined in Section 3.3.1.

"Securities Act" means the Securities Act of 1933, as amended, and the regulations promulgated thereunder.

"Selling Security Holder" is defined in Section 3.1.

7

"Shares" means and includes: (i) shares of Class A Voting Common Stock, par value $0.01 per share, of the Company; (ii) shares of Class B Non-voting Common Stock, par value $0.01 per share, of the Company; (iii) all other shares of capital stock of the Company of every class and series (whether presently or hereafter authorized or issued); (iv) any shares of capital stock or other securities into which any of the stock described in the foregoing clauses (i) through (ii) may have been changed or converted (or for which any such stock may have been exchanged) in connection with any reclassification, recapitalization, merger, consolidation, combination, share exchange or other corporate transaction or event having a similar effect; and (v) any voting trust certificates representing any of the foregoing, all as may be issued and outstanding as of the time to which reference is made. In the case of Shares which constitute "community property" under applicable law, the term "Shares" includes the community property interest of a Stockholder's spouse in such Shares.

"Stockholder" means each registered holder of issued and outstanding Shares who is a party to this Agreement, and any executor, administrator, guardian, custodian, trustee, receiver, or other legal representative of such registered holder who obtains legal or beneficial ownership of any Shares and the ability to transfer the same in the event of such registered holder death, Disability or other incapacity.

"Subsidiary" means an Affiliate of the Company within the meaning of the definition of "subsidiary corporation" provided in Section 424(f) of the Code, or any successor statute of similar import, and also means a Person of which such a subsidiary corporation or the Company is the owner of fifty percent (50%) or more of the interests entitling the owners thereof to participate in the management of the affairs of such Person.

"Total Fully Diluted Shares" means, at any time, a number equal to the sum of (i) the number of Shares issued and outstanding at such time, plus (ii) the number of Shares issuable at such time upon the exercise in full of all outstanding Options and the conversion or exchange in full of any other outstanding securities convertible into or exchangeable for Shares.

To "Transfer" means to sell, give, assign, pledge, bequeath, exchange, dispose of, hypothecate, or otherwise transfer whether by testamentary disposition, survivorship arrangement or otherwise, encumber in any respect, or grant any interest in (whether voluntarily or involuntarily or by operation of law and whether with or without consideration), and specifically includes

8

all transfers upon divorce, in bankruptcy or by way of execution, seizure, or sale by legal process.

"Transfer Notice" is defined in Section 3.1.

## ARTICLE 2. RESTRICTIONS ON TRANSFER

2.1     In General.

No Stockholder, and no spouse of a Stockholder whose Shares constitute "community property" under applicable law, shall Transfer any Shares except in accordance with the provisions of this Agreement. Any attempt to Transfer any Shares other than in accordance with the provisions of this Agreement shall be void and of no force or effect. The Company shall not make any transfer of record of any Shares except pursuant to a Transfer effected in accordance with the provisions of this Agreement.

2.2     Prohibition on Transfer to Competitors.

To protect the competitive advantage of the Company, under no circumstances may Shares be Transferred (other than pursuant to Section 8) to any Person who is, or is employed by or affiliated in any way with a Person who is, engaged in business in competition with the Company or any Subsidiary; provided, that in no event shall any bank, insurance company or other institutional investor be deemed, for purposes of this Section 2.2, to be engaged in competition with the Company or any Subsidiary.

2.3     Agreement Legend.

Each Stockholder shall promptly deliver to the Company any certificates or other instruments representing Shares for placement thereon of a legend in substantially the following form:

The securities represented hereby are subject to and are transferable only after compliance with the provisions of the Stockholders' Agreement, dated June ___, 2010, as amended from time to time, among Taylor Lumber Holdings, Inc. (the "Company") and certain other persons. A copy of such agreement is on file at the Company's principal offices and, upon written request to the Company, a copy thereof will be mailed or otherwise provided to appropriately interested persons without charge within 5 days after the Company's receipt of such a request.

2.4     Securities Act Legend.

The Shares have not been registered under the Securities Act, and may not be Transferred except in compliance therewith. Each Stockholder acknowledges and agrees that in addition to the other restrictions on Transfer imposed hereunder, the Shares may not be Transferred except after compliance with the provisions of a legend in substantially the following form, which shall be placed on each certificate or other instrument representing Shares:

The securities represented hereby have not been registered under the Securities Act of 1933, as amended (the "Act"), or any state securities laws, and may not be sold, transferred or otherwise disposed of unless a registration statement under the Act and any applicable state securities laws with respect to such securities has become effective or unless the holder hereof establishes to the satisfaction of the issuer hereof that an exemption from such registration is available.

2.5     Placement of Restrictive Legends.

All certificates or other instruments representing Shares hereafter issued to any Stockholder during the term of this Agreement shall bear the legends set forth in Sections 2.3 and 2.4, except for any certificates or other instruments representing Shares which are released from the restrictions hereof pursuant to the provisions herein.

2.6     Removal of Restrictive Legends.

If, for any reason, any of the Shares are no longer subject to the provisions of Section 2.3 or Section 2.4, or both, the Company shall promptly issue a new certificate or other applicable instrument for such Shares without the legend set forth in Section 2.3 or Section 2.4, or both, as applicable, upon the request of the record owner thereof and the surrender to the Company of the certificate or other instrument containing such legends.

2.7     Certain Transfers Not Subject to Rights of First Refusal.

2.7.1.  Permitted Transfers.

Notwithstanding any contrary provision in this Agreement, but subject to the qualifications set forth in Section 2.7.2, the Company and Resilience shall not have any rights pursuant to Article 3 with respect to:

(a)     any Transfer of Shares by any Stockholder who is an individual to (i) such individual stockholder's spouse or issue (including, without limitation, adopted issue) or to a trust for the benefit of any one or more of such individual Stockholder, his spouse or issue, or (ii) to a corporation, partnership or limited liability company directly or indirectly controlled by such individual Stockholder, in each case if (but only if) the Board of Directors shall have approved such Transfer in its sole discretion in advance of such Transfer; or

(b)     any Transfer of Shares by any Stockholder to any Co-Sale Purchaser pursuant to Article 7 or to any Drag-Along Purchaser pursuant to Article 8.

2.7.2.  Qualifications.

Notwithstanding Section 2.7.1, as a condition precedent to any Transfer described in any of clause (a) of Section 2.7.1 and the issuance of any certificate or other instrument evidencing such Shares, the transferee of such Shares in such Transfer (the "Permitted

10

Transferee") shall be or shall have become a party to this Agreement and shall have agreed in writing to be bound by all of the terms and conditions hereof applicable to the transferring Stockholder. Notwithstanding Section 2.7.1, the provisions of Article 3 shall apply, and Section 2.7.1(a) shall not apply, to any proposed Transfer of Shares by an individual Stockholder to such individual's spouse pursuant to a judgment or decree of divorce, dissolution or similar termination of marriage or pursuant to any property settlement or similar arrangement entered into in connection with a marital separation, divorce or dissolution.

2.8    Issuance of Shares to Certain Persons.

The Company shall not issue any Shares (or any securities convertible into or exchangeable, directly or indirectly, for Shares), to any individual (or Person controlled by such individual) employed by the Company or any of its Subsidiaries unless in each case such Person shall be or shall have become a party to this Agreement and shall have agreed in writing to be bound by all of the terms and conditions hereof applicable to a Stockholder. The Company shall not issue Shares, in the aggregate, to such individuals in excess of 15% of the common stock of the Company on a fully diluted basis.

## ARTICLE 3. RIGHTS OF FIRST REFUSAL

3.1    In General.

If a Non-Resilience Stockholder desires to Transfer any Shares other than as provided in Section 2.7 or Articles 4, 7 or 8 of this Agreement, then such Non-Resilience Stockholder (the "Selling Security Holder") shall deliver written notice to the Company and to Resilience (the "Transfer Notice") of (a) the number and type of the Shares proposed to be Transferred (the "Offered Securities"), (b) the identity of the proposed transferee, (c) in the case of a proposed sale or exchange for value, the price at which such Shares are proposed to be Transferred, (d) in the case of a proposed sale or exchange for value, the terms of the proposed Transfer, including the payment terms, and (e) in the case of a proposed sale or exchange for value, a representation by the Selling Security Holder to the Company to the effect that the Selling Security Holder has received from such proposed transferee an offer to acquire, or an acceptance of an offer made by the Selling Security Holder to Transfer, the Offered Securities at the price and upon the terms contained in the Transfer Notice.

3.2    Option of Company.

3.2.1.    Conditions Giving Rise to Option.

When the Transfer Notice is given to the Company, the Company shall have the right and option (the "Company Option") to purchase all or any portion of the Offered Securities.

3.2.2.    Exercise of Company Option.

If the Company desires to exercise the Company Option, it shall deliver notice to that effect to the Selling Security Holder within 30 days after the Transfer Notice is given to the Company, setting forth in such notice the number of the Offered Securities which the Company

11

desires to purchase pursuant to the Company Option. If the Transfer Notice does not contemplate a proposed sale or exchange for value, the Company Option shall be exercisable at the FMV Price per Share and on the Agreement Terms. If the Transfer Notice contemplates a proposed sale or exchange for value, the Company Option shall be exercisable at the price per Share and on the payment and other terms set forth in the Transfer Notice. Any exercise of the Company Option shall include, however, the additional terms contained in Section 10.1.

### 3.2.3. Consummation of Purchase.

If the Company exercises the Company Option in accordance with Section 3.2.2 with respect to all of the Offered Securities, a purchase and sale agreement shall be deemed to have been created between the Company, as purchaser, and the Selling Security Holder, as seller, providing for the purchase and sale of all of the Offered Securities consistent with the provisions of Section 3.2.2. Such purchase and sale shall be consummated not later than 60 days after the Transfer Notice is given. If the Company desires to purchase some but less than all of the Offered Securities, then the Company's right to purchase any Offered Securities shall be contingent upon the exercise in full of the Secondary Option described in Section 3.3.

### 3.3   Option of Resilience and Designees.

### 3.3.1. Conditions Giving Rise to Option.

If the Company does not exercise the Company Option in accordance with Section 3.2.2 with respect to all of the Offered Securities, the Company shall provide written notice of that fact to Resilience within one (1) business day after the expiration of the 30-day period described in Section 3.2.2, setting forth the number of Offered Securities with respect to which the Company has not exercised the Company Option, whereupon any one or more of Resilience or its Affiliates (collectively, the "Resilience Optionees") shall have the right and option to purchase in the aggregate all, but not less than all, of such remaining Offered Securities (the "Secondary Option").

### 3.3.2. Exercise of Secondary Option.

If the Resilience Optionees desire to exercise the Secondary Option, they shall deliver notice to that effect to the Selling Security Holder and to the Company within 45 days after the Transfer Notice is given. If the Transfer Notice does not contemplate a proposed sale or exchange for value, the Secondary Option shall be exercisable at the FMV Price and on the Agreement Terms. If the Transfer Notice contemplates a proposed sale or exchange for value, the Secondary Option shall be exercisable at the price per Share and on the payment and other terms set forth in the Transfer Notice. Any exercise of the Secondary Option shall include, however, the additional terms contained in Section 10.1.

### 3.3.3. Consummation of Purchase.

If, within 45 days after the Transfer Notice is given, the Company or the Resilience Optionees individually or collectively deliver notice of a desire to purchase all, but not less than all, of the Offered Securities, then a purchase and sale agreement shall be deemed to have been created among the Company or the Resilience Optionees or both, as purchasers, and

the Selling Security Holder, as seller, providing for the purchase and sale of the Offered Securities consistent with the provisions of Sections 3.2.2 and 3.3.2. Such purchase and sale shall be consummated not later than (a) 75 days after the Transfer Notice is given if the Transfer Notice contemplates a proposed sale or exchange for value or (b) 30 days after the determination of the FMV Price if the Transfer Notice does not contemplate a proposed sale or exchange for value.

3.4    Consequences of Failure to Consummate Purchase and Sale.

If (i) a purchase and sale agreement is created in accordance with the provisions of Section 3.2.3 or 3.3.3 but is not consummated within the respective time periods provided therein and (ii) the parties to the transaction do not agree (neither party being under any obligation to so agree) in writing to a cancellation or rescission of such purchase and sale agreement or an extension of the applicable time period prior to the expiration thereof, then such Selling Security Holder may Transfer such Offered Securities to any Person at any time and upon any terms, provided, that such Offered Securities and any transferee thereof shall be bound by Section 3.6.

3.5    Transfer Upon Lapse of Options.

If the parties granted the options to purchase pursuant to this Article 3 do not exercise such options in full within 45 days after the Transfer Notice is given, then at the expiration of such period pursuant to this Article 3 (or at such earlier time as the Company and Resilience shall have delivered notice to the Selling Security Holder that they do not intend, in the aggregate, to purchase all of the Offered Securities), the Selling Security Holder shall be entitled for a period of 60 days (but not thereafter without first having again complied with the provisions of this Article 3) to Transfer the Offered Securities to the proposed transferee identified in the Transfer Notice, at a purchase price which is not less than 95% of the purchase price set forth in the Transfer Notice and upon terms which are not more favorable to such transferee (as reasonably determined by the Selling Security Holder) than the terms set forth in the Transfer Notice.

3.6    Consequence of Transfer.

Upon a Transfer of any Shares pursuant to the provisions of Section 3.4 or Section 3.5, the Shares so Transferred and the transferee thereof and any subsequent transferee of such Shares shall continue to be subject to the rights, restrictions and obligations set forth in this Agreement, including, without limitation, the obligation to Transfer such Shares to the Company upon the exercise of a Call Option in accordance with the terms and conditions of Articles 4, if the Selling Security Holder is an Employed Security Holder. As a condition precedent to the effectiveness of such Transfer and the issuance of any certificate or other instrument representing such Transferred Shares, the transferee thereof shall execute and deliver to the Company either a duplicate counterpart of this Agreement or, if requested by the Company, a modified version reflecting only the particular rights and obligations applicable to such transferee.

## ARTICLE 4. CALL OPTIONS OF COMPANY

4.1     Conditions Giving Rise to Call Option.

At any time following the termination of the employment of an Employed Security Holder for any reason or the termination or expiration of the consulting engagement of a Consultant Security Holder for any reason, then: (i) all Shares owned by such Employed Security Holder or Consultant Security Holder (including, without limitation, any Shares issued upon the exercise of an Option, even if such issuance occurs after a Call Option arises), and (ii) all Shares held by any other Stockholder (other than a Listed Security Holder) which were at any time owned by such Employed Security Holder or Consultant Security Holder and Transferred by him pursuant to either Section 2.7.1(a) or Section 3.5 hereof (collectively, "Call Option Securities") shall be deemed to be irrevocably offered for sale to the Company, and the Company shall have the right and option, continuing without expiration after such anniversary date or termination of employment or engagement, to purchase all, but not less than all, of the Call Option Securities (a "Call Option").

4.2     Exercise of Call Option.

The Company may exercise a Call Option by delivering notice of exercise to each holder of Call Option Securities (a "Call Option Notice"). Upon the delivery of a Call Option Notice, a purchase and sale agreement shall be deemed to have been created between the Company, as purchaser, and each holder of Call Option Securities, as seller, providing for the purchase and sale of the Call Option Securities at the price applicable to such transaction pursuant to Section 4.3, and upon the Agreement Terms. Each such purchase and sale shall be consummated by the Company and the holder of Call Option Securities not later than 30 days after the delivery of the Call Option Notice. If the purchase and sale of any Call Option Securities is not consummated in such period, such Call Option Securities shall remain subject to the continuing obligation of the Company and such holder to consummate the purchase and sale until the purchase and sale is consummated, and may not otherwise be Transferred.

4.3     Price Applicable to Call Option.

Each purchase and sale of Call Option Securities pursuant to the exercise of such Call Option shall be effected at price determined as follows:

(a)     in the case of an Employed Security Holder whose employment is terminated for Cause, or voluntarily by the Employed Security Holder (other than for Good Reason, Disability, Retirement or death), the purchase price shall be the lower of: (x) the Book Value Price; and (y) the FMV Price.

(b)     in the case of an Employed Security Holder whose employment is terminated by the Company for any reason other than Cause, or by the Employed Security Holder for Good Reason, Disability, Retirement or death, the purchase price shall be the higher of: (x) the Book Value Price and (y) the FMV Price.

14

(c) in the case of a Consultant Security Holder whose consulting engagement is terminated for Cause, the purchase price shall be the lower of: (x) the Book Value Price; and (y) the FMV Price.

(d) in the case of a Consultant Security Holder whose consulting engagement is terminated for any reason other than Cause or by expiration of the consulting agreement, the purchase price shall be the higher of: (x) the Book Value Price and (y) the FMV Price.

(e) in the case that the Company exercises the Call Option after the third (3rd) anniversary of the date of this Agreement (and not by reason of the termination of employment of a Employed Security Holder or the termination of the engagement of a Consultant Security Holder), then the purchase price shall be the higher of: (x) the Book Value Price and (y) the FMV Price.

4.4     Exclusion.

Notwithstanding anything to the contrary contained herein, for purposes of this Article 4, Graf shall not be deemed a Consultant Security Holder subject to the terms and conditions of this Article 4.

## ARTICLE 5. INFORMATION RIGHTS AND OTHER COVENANTS

5.1     Inspection.

Stockholders shall be entitled to all inspection rights afforded stockholders under the General Corporation Law of the State of Delaware.

5.2     Financial Statements and Other Information.

The Company and its subsidiaries shall maintain true books and records of account in which full and correct entries shall be made of all its business transactions pursuant to a system of accounting established and administered in accordance with generally accepted accounting principles consistently applied, and shall set aside on its books all such proper accruals and reserves as shall be required under generally accepted accounting principles consistently applied. The Company shall deliver to Stockholders holding more than a 20% equity position in the Company:

(a) within 30 days following the end of each month, unaudited financial statements for such month and for the current fiscal year to date;

(b) within 120 days following the end of each fiscal year, audited financial statements for such fiscal year; and

(c) at least 15 days prior to the beginning of each fiscal year, an annual operating plan and budget for the Company and its subsidiaries), prepared on a monthly basis for the ensuing fiscal year, and on a basis consistent with prior periods (including, among other items, appropriate reserves, accruals and provisions for income taxes) and

representing a good faith estimate of the Company based upon available information. The Company shall also furnish to Graf, within a reasonable time of its preparation, material amendments to said annual budget, if any, which material amendments must be approved by the Board.

(d)     The Company's "financial statements" shall include a balance sheet, statement of earnings, stockholders' equity and cash flows for the Company and its subsidiaries for the applicable periods, prepared in accordance with generally accepted accounting principles consistently applied, all certified by the Company's Chief Executive Officer or Chief Financial Officer to (i) have been prepared in accordance with generally accepted accounting principles consistently applied, with the exception that unaudited financial statements need not have notes attached and are subject to year-end audit adjustments and (ii) present fairly in all material respects the consolidated financial position of the Company as of the dates specified and the results of their respective operations and changes in financial position with respect to the periods specified (subject in the case of interim financial statements only to normal year-end audit adjustments described in reasonable detail). Notwithstanding the foregoing, to the extent the Company is required to deliver financial statements to any senior lender, delivery of such information, in such form as may be required by such senior lender, shall satisfy the requirements under this Section 5.2.

## ARTICLE 6. SUBSEQUENT SALE OF THE COMPANY

6.1     Sale of the Company.

Each of the parties to this Agreement acknowledges and agrees that, at the time of a sale to the Company or a Resilience Optionee of Offered Securities pursuant to Article 3, there may be proposed or pending a transaction or series of related transactions involving the sale or issuance of fifty percent (50%) or more (as measured immediately after such issuance) of the outstanding shares of voting capital stock of the Company (measured by voting power in the election of directors of the Company) (either to a Person or group of Persons acting in concert or pursuant to a public offering of such stock registered under the Securities Act), or the redemption or repurchase of all of the shares of capital stock of the Company in connection with a sale of all or substantially all of the assets of the Company, or the winding up, dissolution or liquidation of the Company (any such transaction or series of related transactions is referred to in this Article 6 as a "Sale of the Company"). The Company and the Resilience Optionees agree that they shall provide notice of any such proposed or pending Sale of the Company (each, a "Sale Notice") to the holder(s) of such Offered Securities at the time of receipt of a Transfer Notice. The Sale Notice shall set forth (a) in the case of a proposed sale or exchange for value of the shares of the Company, the price at which such shares are proposed to be transferred or (b) in the case of a proposed sale of all or substantially all of the assets, the price at which such assets are proposed to be transferred.

6.2     Look-Back Provision.

If a transaction involving a Sale of the Company is effected (a) within 6 months after the closing date of a sale to the Company or to a Resilience Optionee of Offered Securities (an

"Article 3 Transaction"), (A) the Company shall pay or cause to be paid to each seller of such Offered Securities, for each Share so sold to the Company, and (B) Resilience shall pay or cause to be paid to each seller of Offered Securities, for each Share so sold to a Resilience Optionee, an amount equal to:

(i)     the amount per Share realized by the stockholders of the Company upon such Sale of the Company (after being adjusted downward, if necessary, as though such Offered Securities were outstanding at the time such Sale of the Company is consummated); less

(ii)    the purchase price per Share paid by the Company to such seller for such Offered Securities, or by a Resilience Optionee to such seller for such Offered Securities.

## ARTICLE 7.  CO-SALE RIGHTS

7.1    Co-Sale Rights.

If any Resilience Stockholder at any time proposes to Transfer any Resilience Shares to any other Person or Persons (such Person or Persons are hereinafter referred to collectively as the "Co-Sale Purchasers"), then, unless (i) such proposed Transfer is an Exempt Transfer or unless (ii) under the circumstances of such proposed Transfer, Resilience is entitled to and does exercise the Drag-Along Right pursuant to Article 8 hereof, as a condition precedent to such Transfer such Resilience Stockholder shall afford each Non-Resilience Stockholder the right to participate in such Transfer in accordance with this Article 7.

7.2    Co-Sale Notice.

Any Resilience Stockholder desiring to Transfer any Resilience Shares to Co-Sale Purchasers shall give written notice to each Non-Resilience Stockholder (a "Co-Sale Notice") not less than 15 nor more than 45 days prior to any proposed Transfer of any such Resilience Shares. Each such Co-Sale Notice shall:

(i)     specify in reasonable detail (A) the number and kind of Resilience Shares which such Resilience Stockholder proposes to Transfer, (B) the identity of the Co-Sale Purchasers, (C) the time within which, the price per Share at which, and all other terms and conditions upon which such Resilience Stockholder proposes to Transfer such Resilience Shares, and (D) the percentage of the Resilience Shares then owned by such Resilience Stockholder which such Resilience Stockholder proposes to Transfer to the Co-Sale Purchasers;

(ii)    make explicit reference to this Section 7.2 and state that the right of each Non-Resilience Stockholder to participate in such Transfer hereunder shall expire unless exercised within 15 days after receipt of such Co-Sale Notice; and

(iii)   contain an irrevocable offer by the selling Resilience Stockholder to each Non-Resilience Stockholder to participate in the proposed transfer to the extent provided in Section 7.3.

17

### 7.3    Co-Sale Participation.

Each Non-Resilience Stockholder shall have the right (a "Co-Sale Right"), exercisable in accordance with Section 7.4, to Transfer to the Co-Sale Purchasers the same percentage and same class of Shares (or, if such Non-Resilience Stockholder shall elect, any lesser percentage) of such Non-Resilience Stockholder's Shares as the selling Resilience Stockholder Transfers to the Co-Sale Purchasers, at the same price per Share and on the same terms and conditions as are applicable to the proposed Transfer by such selling Resilience Stockholder; provided, that each Non-Resilience Stockholder electing to participate in such proposed Transfer shall be obligated to indemnify the Co-Sale Purchasers upon the same terms and conditions as are applicable to the indemnification given by the selling Resilience Stockholder in connection with such proposed Transfer so long as all indemnification obligations are shared severally among all transferors in proportion to the consideration paid to each transferor; and provided, further, that, upon the request of such selling Resilience Stockholder, each Non-Resilience Stockholder shall enter into agreements with the Co-Sale Purchasers containing the same terms and conditions (including, without limitation, any noncompetition, nonsolicitation, confidentiality or similar restrictive covenants (collectively, the "Restrictive Covenants")) relating to the sale that are contained in the agreement that such selling Resilience Stockholder has executed or will execute in connection with the transaction contemplated by this Article 7. Notwithstanding the foregoing, Graf's indemnification obligation to any Co-Sale Purchaser (i) shall be limited to 50% of the consideration paid to Graf pursuant to any such transaction and (ii) shall not cover breaches of any representations, warranties or covenants made individually by, and applicable individually to, any Stockholder (such as title to stock and Restrictive Covenants). All calculations pursuant to this Article 7 shall be made on a fully diluted basis (assuming the full conversion, exercise and exchange of all in-the-money, currently exercisable Options and other securities convertible into or exchangeable for Shares), and shall be carried out to a tenth of a Share and then rounded to the nearest whole Share and the percentage limitations applicable to an Exempt Transfer shall not apply in the case of a transaction giving rise to a Co-Sale Right.

### 7.4    Exercise of Co-Sale Rights.

Each Non-Resilience Stockholder must notify such selling Resilience Stockholder, within 15 days after receipt of the Co-Sale Notice, if such Non-Resilience Stockholder desires to accept such offer and to Transfer any of the Shares owned by or issuable to it in accordance with this Section 7.4. The failure of any Non-Resilience Stockholder to provide such notice within such 15 day period shall, for purposes of this Article 7, be deemed to, constitute a waiver by such Non-Resilience Stockholder of its right to transfer any of the Shares owned by or issuable to it in connection with the proposed Transfer described in such Co-Sale Notice. The selling Resilience Stockholder will use commercially reasonable efforts to obtain the agreement of the Co-Sale Purchasers to the participation of the Non-Resilience Stockholder in such proposed Transfer and will not consummate any such proposed Transfer unless each Non-Resilience Stockholder electing to participate therein is permitted to participate in accordance with the provisions of this Section 7.4. No Non-Resilience Stockholder shall be obligated to Transfer any Shares pursuant to this Article 7. Any and all Transfers of Shares by any Non-Resilience Stockholder pursuant to this Article 7 shall be effected either concurrently with or prior to the Transfer of Resilience Shares by the selling Resilience Stockholder.

18

## ARTICLE 8. DRAG-ALONG RIGHTS

8.1    Drag-Along Rights of Resilience.

If Resilience at any time proposes to Transfer any Resilience Shares to a proposed transferee or transferees who shall have offered in writing to acquire a number of Shares that is greater than the number of Shares then owned by all Resilience Stockholders in the aggregate (such proposed transferee or transferees are hereinafter referred to collectively as the "Drag-Along Purchasers"), then Resilience shall have the right (the "Drag-Along Right"), exercisable in accordance with Section 8.2, to require each other Stockholder to Transfer to the Drag-Along Purchasers all, but not less than all, of the Shares then owned by or issuable to such Stockholder. Each Stockholder shall Transfer its Drag-Along Shares to the Drag-Along Purchasers at the same price per Share and on the same terms and conditions as are applicable to the Drag-Along Shares to be sold by the Resilience Stockholders; provided, that each other Stockholder shall be obligated to indemnify the Drag-Along Purchasers upon the same terms and conditions as are applicable to the indemnification given by the Resilience Stockholders in connection with such transfer so long as all indemnification obligations are shared severally among all transferors in proportion to the consideration paid to each transferor, and provided, further, that, upon the request of Resilience, each other Stockholder shall enter into agreements with the Drag-Along Purchasers containing the same terms and conditions (including, without limitation, Restrictive Covenants) relating to the sale that are contained in the agreement that Resilience has executed or will execute in connection with the transaction contemplated by this Article 8; and provided, further, that, subject to the foregoing limitations in two preceding provisos, if any Stockholder fails to enter into any agreement required under this Section 8.1, such Stockholder shall nonetheless be bound by all obligations (including, without limitation, the Restrictive Covenants) and assume all liabilities of a seller of Shares under the agreement or agreements entered into by Resilience. Notwithstanding the foregoing, Graf's indemnification obligation to any Drag-Along Purchaser (i) shall be limited to 50% of the consideration paid to Graf pursuant to any such transaction and (ii) shall not cover breaches of any representations, warranties or covenants made individually by, and applicable individually to, any Stockholder (such as title to stock and Restrictive Covenants). All calculations pursuant to this Article 8 shall be made on a fully diluted basis (assuming the full conversion, exercise and exchange of all Options and other securities convertible into or exchangeable for Shares), and shall be carried out to a tenth of a Share and then rounded to the nearest whole Share. Without limitation as to the foregoing, each Stockholder shall consent to and raise no objections against any transaction contemplated by this Article 8 and if such transaction is structured as a merger or consolidation, each Stockholder shall waive any dissenters' rights, appraisal rights or similar rights in connection with such merger or consolidation.

8.2    Drag-Along Notice.

If Resilience wishes to exercise the Drag-Along Right, Resilience must give written notice to each other Stockholder (a "Drag-Along Notice") not less than 30 nor more than 90 days prior to the date upon which such sale is scheduled to close. Each Drag-Along Notice shall (i) specify in reasonable detail all of the terms and conditions upon which such sale is to occur, and (ii) make explicit reference to this Article 8 and state that such Stockholder is obligated to sell such Stockholder's Drag-Along Shares pursuant to such sale. Upon request by any Stockholder,

Resilience shall provide to such Stockholder copies of all documentation relating to the proposed sale and such other materials and information as any Stockholder may reasonably request in connection therewith.

## ARTICLE 9. CERTAIN OFFERINGS OF SECURITIES

### 9.1 Anti-Dilution Option.

Subject to Section 9.2, if, after the date of this Agreement, the Company determines to issue any Shares (an "Issuance"), the Company shall, within 5 business days after such Issuance, deliver a notice (a "Dilution Notice") to each Non-Resilience Stockholder (other than the Stockholder, if any, to whom or to whose Affiliate such Shares were or are to be issued) (each, an "Anti-Dilution Optionee"), setting forth the number and class(es) of Shares issued or to be issued, the date or proposed date of such Issuance, the price and other terms and conditions of such Issuance, and the number of Shares which the Anti-Dilution Optionee shall be entitled to purchase pursuant to the Anti-Dilution Option described herein below. Each Anti-Dilution Optionee shall have the right and option (the "Anti-Dilution Option"), but no obligation, to purchase from the Company, at the price and upon the other terms and conditions contained in the Dilution Notice, up to such number of Shares equal to the Anti-Dilution Optionee's percentage ownership of Shares, without regard to class or series, on a fully diluted basis (assuming the full conversion, exercise and exchange of all in-the-money, currently exercisable Options and other securities convertible into or exchangeable for Shares) immediately before such Issuance. An Anti-Dilution Optionee may exercise the Anti-Dilution Option only by delivering notice of exercise thereof to the Company within 30 days after the Dilution Notice is given, together with payment for the Shares being purchased pursuant to the Anti-Dilution Option in accordance with the terms and conditions contained in the Dilution Notice.

### 9.2 Excluded Issuances.

Notwithstanding Section 9.1, no Anti-Dilution Option shall apply to or arise in connection with any of the following: (i) an issuance of Shares or Options pursuant to a share split or share dividend; (ii) an issuance of Shares pursuant to an effective registration statement under the Securities Act; (iii) an issuance of Shares pursuant to the exercise or conversion of any Option; (iv) an issuance of Shares for consideration other than cash or its equivalent or readily marketable securities; (v) an issuance of Shares of any class or series pursuant to an exchange or conversion of Shares of another class or series in accordance with the Certificate of Incorporation of the Company, as amended; (vi) any issuance to an employee (or prospective employee) of the Company or any of its subsidiaries who is not otherwise a Stockholder, or (vii) any issuance of Shares directly or indirectly to any lender (other than any Resilience Entity or any of its Affiliates) in connection with the extension or restructuring of credit to the Company or its Subsidiaries.

## ARTICLE 10. AGREEMENT TERMS

### 10.1 In General.

Regardless of whether a Transfer is otherwise to be made upon the Agreement Terms, unless the transferor and transferee shall otherwise agree, any Stockholder transferring any

Shares to the Company or to any other Stockholder hereunder shall do so by delivering to such transferee (a) the certificate, certificates or other instruments representing the Shares to be transferred, which shall be duly endorsed (or accompanied by an irrevocable stock power or power of transfer, duly endorsed) and otherwise in proper form for transfer, and (b) the transferor's written representation and warranty to such transferee, which shall survive the consummation of such transfer and continue to be binding thereafter, that such transfer is not wrongful as against any Person and that no other Person is the owner of or possesses any ownership, security or other interest in such Shares. Notwithstanding anything to the contrary herein, prior to any payment pursuant to the exercise of any Call Option, Company Option or Secondary Option, the aggregate purchase price to be paid shall be reduced by the amount of any indebtedness for borrowed money of the transferring Stockholder owed to the Company (including any unpaid subscription amount with respect to the Shares to be Transferred).

10.2    Payment Terms.

Unless the purchaser of any Shares to be transferred on the Agreement Terms should agree with the Stockholder transferring such Shares as to different payment terms, the purchaser shall deliver cash or its equivalent at the time that title to the Shares is transferred in an amount (not to exceed the aggregate purchase price) equal to the greater of (a) twenty percent (20%) of the aggregate purchase price for the Shares, or (b) the proceeds, if any, received by the purchaser or an affiliate thereof of the Shares from any life insurance policies maintained by and payable to the purchaser or such affiliate on the life of an individual Stockholder, if that Stockholder's death is the event giving rise to such purchase and sale of the Shares. The balance of the purchase price in such case shall be satisfied by the purchaser's execution and delivery of a promissory note in the form of Exhibit B to this Agreement, dated as of the date on which title to the Shares is transferred and providing for the balance of the aggregate purchase price to be paid in four (4) equal annual installments of principal commencing on the first anniversary of the date of such note, together with interest on the unpaid principal balance which shall accrue at a rate per annum equal to the lowest rate of interest available to the Company for short-term borrowings under its senior institutional credit facilities in effect on the date of such note, provided that if no such facility is then in effect, then at a rate of interest equal to the base rate on corporate loans posted by the New York office of Citibank, N.A. (the "Prime Rate") as published on the date of such note in The Wall Street Journal (or, if such date is not a business day, on the next preceding business day), and shall be payable in accordance with the provisions of Exhibit B. Notwithstanding anything contained herein to the contrary, each of the parties hereto hereby acknowledges and agrees that the payment of any and all amounts owing under a promissory note issued by the Company referred to in this Section 10.2 shall be subordinate in right, time and manner of payment to the payment in full of all outstanding indebtedness and other obligations then owed by the Company to the holders of its senior subordinated notes and junior subordinated notes (such holders being collectively referred to herein as the "Subordinated Debt Lenders"). Each of the parties hereto further agrees that, as a condition precedent to issuance of any such note by the Company, the Company and any applicable proposed payee thereof shall execute and deliver to the Subordinated Debt Lenders a Subordination Agreement in form and substance acceptable to such Subordinated Debt Lenders in their sole discretion.

21

10.3    Limitations on Purchase of Shares By Company.

Notwithstanding any other provision in this Agreement, the Company shall not be required to purchase any Shares under any provision of this Agreement to the extent that the purchase of such Shares would violate or cause the Company to be in violation of any applicable law, including but not limited to the provisions of Section 160 of the General Corporation Law of the State of Delaware (or any successor statutory provision), or would constitute or cause a breach of any provisions of any agreement between the Company or any Subsidiary and any bank or other institutional lender, or of any note or other instrument delivered by the Company or a Subsidiary under the terms thereof. If the Company is obligated to purchase any Shares hereunder and such purchase would be precluded by law or by contract as described above, then the Company and the selling Stockholder shall use their respective best efforts to accomplish such purchase and sale in a manner not in violation of any applicable law or contract, including, where appropriate, the Company's use of its best efforts to secure any necessary waiver or consent from its institutional lender(s), and the attempt by the parties to such transaction to modify the Company's payment terms or schedule for purchase of such Shares in such a manner as to comply with the requirements of applicable law; provided, that in no event will the Company or the Stockholders be required hereunder to effect a reduction of the Company's stated capital or a revaluation of its assets. Notwithstanding the limitations set forth in this Section 10.3, if the Company becomes obligated to purchase any Shares hereunder, at a minimum the Company shall promptly purchase as many such Shares as it is permitted to purchase under applicable law and its agreements with its institutional lender(s) and shall continue to purchase the remainder of such Shares as purchases become permissible.

10.4    Determinations of Price Etc.

Any determinations as to the "price" of any non-cash consideration set forth in any Transfer Notice under Section 3.1, or as to any other economic matter relating to the Transfer of Shares shall be made by mutual agreement of the Board of Directors of the Company and the owner of the Shares to be Transferred. If such parties are unable to reach agreement on any such matter within a reasonable period of time, however, then such matter shall be submitted to the Company's independent accountants, whose determination shall be final and binding upon the parties. In addition, to the extent that it is necessary to make a determination as to the fair market value of any real or tangible personal property, or of any other assets whose value the Company's independent accountants indicate that they are not qualified to determine, such determination of fair market value shall be conclusively made by a reputable, independent appraiser regularly engaged in valuing the type of property at issue and selected by the Board of Directors of the Company and reasonably acceptable to the owner of the Shares to be Transferred, or, if such parties are unable to agree upon the selection of such appraiser within a reasonable period of time, selected by the Company's independent accountants. The fees of any such appraiser shall be borne by the Company; provided, if the appraisal of the market value of the Company's shares is within 20% of the Board of Director's determination of the fair market value of the Company's shares, then the fees of any such appraiser shall be borne one-half by the Company and one-half by the owner of the Shares to be Transferred.

## ARTICLE 11. CERTAIN VOTING RIGHTS AND OBLIGATIONS

11.1    Composition of Board of Directors.

Each Stockholder shall cause all of the Shares held of record by such Stockholder and entitled to be voted in elections of directors of the Company to be voted, and will otherwise take or cause to be taken all such other actions as may be necessary, whether in the capacity of a Stockholder or a director of the Company or otherwise, in order that: (a) the number of directors of the Company shall be fixed at a maximum of five (5), and (b) the Board of Directors shall include (i) the Chief Executive Officer of the Company, and (ii) up to four (4) individuals nominated or designated by Resilience (or its designee).

11.2    Voting While Shares are Subject to Option to Purchase.

Each Stockholder, by execution of this Agreement or a counterpart hereof, agrees that if any Shares owned by such Stockholder become the subject of an option to purchase by the Company pursuant to the provisions of this Agreement, then such Stockholder (if and to the extent he possesses voting rights in such circumstances) shall vote on the issue of whether the Company shall exercise its option to purchase such Shares, in accordance with the majority of the votes cast on the matter by Resilience.

11.3    Termination of Stockholder Rights.

Each Stockholder acknowledges and agrees that if Shares owned by him are required to be Transferred pursuant to a Company Option, Secondary Option, Call Option or Drag-Along Right (or other provision of this Agreement requiring the sale of some or all of such Shares), and such Stockholder fails or refuses to deliver such Shares to the transferee in accordance with the terms of this Agreement (and the transferee has not defaulted in his or its obligations with respect to such Transfer), the rights that such Stockholder possessed as the owner of such Shares shall be deemed to be canceled and terminated, effective as of the date upon which the Transfer should have occurred if the Stockholder had not failed or refused to tender such Shares. By way of example, if the Company exercises a Company Option or Call Option with respect to all of the Shares owned by a Stockholder, but the Stockholder fails or refuses to deliver the subject Shares to the Company in accordance herewith, then, as of the date the Transfer should have occurred pursuant to the Company Option or Call Option, the Stockholder shall be deemed to no longer be a stockholder of the Company; and, thereafter, such Stockholder shall not be entitled to claim, receive or exercise any rights which otherwise may exist in favor of stockholders of the Company under this Agreement or otherwise.

11.4    Excess Parachute Payments.

In the event of a Sale of the Company, (a) the Company will provide full and fair disclosure to each of the Stockholders holding voting Shares regarding the material terms of any payments made or to be made by the Company to holders of Options to acquire Shares in the Company where all or any portion of such payments constituted or would constitute an "excess parachute payment" under Section 280G (or any successor thereto) of the Code, and (b) promptly upon receipt of such disclosure each such Stockholder will vote to approve such

23

payments at such time and in such manner as may be required by such section in order to preclude any of such payments from constituting "parachute payments" thereunder.

## ARTICLE 12. TERM OF AGREEMENT

### 12.1 Termination of this Agreement.

This Agreement shall remain in effect until terminated (a) by the written agreement of Stockholders holding in the aggregate Shares representing at least 85% of the Shares held by the Stockholders on the date of such termination; provided, however, that in no event will this Agreement be terminated under this clause (a) without the written consent of Graf, (b) automatically upon the cessation of the Company's business and winding up of its affairs, or (c) automatically upon the closing of any issuance or sale of any Shares in a public offering pursuant to an effective registration statement filed by the Company pursuant to the Securities Act, and at the time of which offering such Shares are or become listed on a national securities exchange or quoted in an over-the-counter market. Notwithstanding any termination of this Agreement, however, the provisions of this Agreement (including, without limitation, the provisions of Article 6) shall survive any such termination to the extent necessary for any Person to enforce any right of such Person which accrued hereunder prior to or on account of such termination.

### 12.2 Removal of Restrictive Legends.

Upon termination of this Agreement, each Stockholder shall surrender to the Company any certificates or other instruments representing Shares which bear the restrictive legend described in Section 2.3, and the Company shall issue a new certificate or other appropriate instrument in lieu thereof representing an equal number of Shares without such restrictive legend.

## ARTICLE 13. MISCELLANEOUS

### 13.1 Notices.

All notices required to be given or delivered under this Agreement shall be in writing and shall be given or delivered as follows, or to such other address for a party as such party may specify in a written notice given in accordance with this Section:

If to the Company, to:

Taylor Lumber Holdings, Inc.
c/o Resilience Capital Partners, LLC
25101 Chagrin Blvd., Ste. 350
Cleveland, OH 44122
Attention: Managing Partner
Facsimile No.: (212) 292-4750

With a copy (which shall not constitute notice) to:

Brian M. O'Neill
Ulmer & Berne LLP
1660 West 2nd Street, Ste. 1100
Cleveland, OH 44113
Facsimile No.: (216) 583-7005

If to a Listed Security Holder, to the address for such Listed Security Holder set forth in Exhibit A to this Agreement.

If to any other Stockholder, to such Person at the address specified by such Person in writing to the Company at the time such Person becomes a Stockholder.

Notices delivered by registered or certified mail or a national overnight air courier service shall be deemed to have been given three business days and one business day, respectively, after the day of registration or documented acceptance by the national overnight air courier service, as the case may be, and in the case of facsimile transmission, upon confirmation of receipt of such transmission. Otherwise, notices shall be deemed to have been given when actually delivered to such address.

13.2    Further Assurances.

From time to time after the date hereof, upon reasonable notice and without further consideration, each Stockholder shall execute and deliver any other document or instrument and shall take any other action as may be necessary in the reasonable discretion of the Board of Directors to give effect to or evidence the provisions of this Agreement.

13.3    Insurance.

The Company shall have the right to obtain insurance on the life of any individual stockholder, whenever, in the opinion of the Company, insurance may be required for the benefit of the Company or to enable it to carry out its obligations hereunder. Each individual Stockholder shall submit to any medical examination requested by the Company for the purpose of obtaining or maintaining any such policy. No Stockholder shall have any rights in or to any such policy, and the Company shall be free at any time to dispose of or retain any such policy in any manner it desires.

13.4    Assignment.

Except as otherwise expressly provided herein, no Stockholder may assign rights or delegate duties arising hereunder without the prior written consent of Stockholders holding in the aggregate Shares representing at least 85% of the Shares held by the Stockholders on the date of such consent, and any assignment or delegation of any right, duty, or claim arising hereunder without such consent shall be void. Notwithstanding the foregoing, in no event may any Stockholder assign rights or delegate duties arising hereunder without the prior written consent of Graf, except in connection with a transfer of Stock permitted by this Agreement.

25

13.5    Injunctive Relief.

Each Stockholder acknowledges that it will be impossible to measure in money the damage to the Company and to the other Stockholders if there is a failure to comply with this Agreement. It is therefore agreed that the Company or any other Stockholder, in addition to any other rights or remedies which they may have, shall be entitled to immediate injunctive relief and to specific performance to enforce this Agreement and that if any action or proceeding is brought in equity to enforce it, no party will urge as a defense that there is an adequate remedy at law.


## ARTICLE 14.  CONSTRUCTION

14.1    Entire Agreement.

This Agreement and the Exhibits hereto (together, in the case of the Resilience Stockholders, with the Institutional Stockholders' Agreement) constitute the exclusive statement of the agreement of the Company and the Stockholders concerning rights and restrictions on Transfers of the Shares held by the Stockholders and supersede all other agreements, oral or written, among or between any of them concerning rights and restrictions on Transfers of the Shares held by the Stockholders. All negotiations among or between any of the Company and the Stockholders are superseded by this Agreement (together, in the case of the Resilience Stockholders, with the Institutional Stockholders' Agreement), and there are no representations, promises, understandings, or agreements, oral or written, in relation thereto among or between any of them other than those incorporated herein (or, in the case of the Resilience Stockholders, in the Institutional Stockholders' Agreement).

14.2    Modification and Waiver.

No amendment, modification, or waiver of this Agreement shall be effective unless made in a written instrument which specifically references this Agreement and which is signed by (a) the Company, (b) Stockholders holding in the aggregate Shares representing at least 85% of the Shares held by all Stockholders on the date of such amendment, modification, or waiver, and (c) by Graf; provided, however, that the Shares owned by Graf may be included in determining whether Stockholders holding Shares representing at least 85% of the Shares have signed such amendment, modification or waiver; provided further, that, the observance of any provision of this Agreement may be waived in writing by the party that will lose the benefit of such provision as a result of such waiver. Notwithstanding the foregoing, this Agreement may be amended by the Stockholders holding a majority of the Shares if such amendment is:  (a) for the purpose of clarification and does not change the substance hereof; and (b) for the purpose of admitting or substituting Stockholders in accordance with this Agreement.  The waiver on the part of any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach, except as otherwise explicitly provided for in such waiver and shall be effective only to the extent specifically set forth in such waiver. Except as expressly provided herein, the failure of the Company or any Stockholder to enforce at any time, or for any period of time, any provisions

26

of this Agreement shall not be construed as a waiver of any provision or of the right of any such Person to enforce each and every provision of this Agreement.

### 14.3 Binding Effect.

This Agreement shall be binding upon and inure to the benefit of the Stockholders and their respective successors, legal representatives and assigns, and shall be binding upon and inure to the benefit of the Company and its successors and assigns.

### 14.4 No Employment Rights.

No provision of this Agreement is intended or may be construed to be a covenant or commitment on the part of the Company or any of its Subsidiaries or Affiliates to offer, extend or guaranty Employment to any Person for any period of time. No provision of this Agreement is intended or may be construed to be a limitation on the right of the Company, any of its Subsidiaries, or any of their respective employees to terminate such employee's Employment at any time, with or without cause, subject to the provisions of any separate contract relating to such Employment which may exist between such parties.

### 14.5 Governing Law; Jurisdiction and Venue.

This Agreement shall be governed by and construed under the laws of the State of Delaware. The parties agree that the exclusive jurisdiction and venue of any lawsuit between them arising under this Agreement shall be the United States District Court for the District of Delaware, or the Court of Chancery located in the State of Delaware, County of Newcastle, and each of the parties hereby irrevocably agrees, acknowledges and submits itself to the exclusive jurisdiction and venue of such courts for the purposes of such lawsuit and agrees to accept service of process in accordance with the provisions for delivery of notice set forth in Section 13.1 hereof.

### 14.6 [Intentionally Omitted].

### 14.7 Severability and Reformation.

If any provision of this Agreement, or the application thereof to any Person or circumstance should, for any reason and to any extent, be invalid or unenforceable, the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected thereby, but rather shall be enforced to the greatest extent permitted by law. In addition, if any of the Transfer restrictions applicable to Shares contained herein should ever be found by a court of competent jurisdiction to be invalid or unenforceable, such court is hereby authorized by the Company and the Stockholders to reform such provision for the purpose of imposing reasonable and enforceable restrictions on the Transfer of Shares so as to carry out the intentions of the Company and the Stockholders in imposing Transfer restrictions designed to ensure unity and continuity in the ownership and control of the Company and to afford the remaining Stockholders a reasonable degree of discretion and control over the admission of other persons as stockholders of the Company.

14.8    Headings.

The Article and Section headings contained in this Agreement are intended solely for convenience of reference and shall not be considered in interpreting this Agreement.

14.9    Gender and Number.

Whenever the context requires in this Agreement, the masculine gender includes the feminine or neuter, the neuter gender includes the masculine or feminine, and the singular number includes the plural.

14.10    Counterparts.

This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument.

14.11    Third Parties.

Nothing expressed or implied in this Agreement is intended or shall be construed to confer on any Person, other than the Company and the Stockholders, any rights hereunder.

14.12    Exhibits.

The Exhibits referenced in this Agreement constitute an integral part of this Agreement as if fully rewritten herein.

14.13    Time Periods.

Any action required hereunder to be taken within a certain number of days shall be taken within that number of calendar days; provided, however, that if the last day for taking such action falls on a Saturday, Sunday, or a holiday observed by the Company, the period during which such action may be taken shall be automatically extended to the next business day.

[SIGNATURE PAGES FOLLOW]

INTENDING TO BE LEGALLY BOUND, the parties hereto have executed this Agreement or have caused this Agreement to be executed by their duly authorized representatives as of the date first written above.

TAYLOR LUMBER HOLDINGS, INC.

By: _____
    Name:  Ronald J. Cozean
    Its:     President


THE RESILIENCE FUND II ANNEX, L.P.

By:  Resilience Capital Partners II Annex, LLC, its General Partner


By: _____
    Name:  Bassem A. Mansour
    Its:  Managing Member


[Consultant Security Holder signature Page Follows]


[Signature Page to Stockholders' Agreement]

INTENDING TO BE LEGALLY BOUND, the parties hereto have executed this Agreement or have caused this Agreement to be executed by their duly authorized representatives as of the date first written above.

TAYLOR LUMBER HOLDINGS, INC.


By:_____
      Name:  Ronald J. Cozean
      Its:     President


THE RESILIENCE FUND II ANNEX, L.P.

By:  Resilience Capital Partners II Annex, LLC, its General Partner

By:_____
      Name:  Bassem A. Mansour
      Its:  Managing Member


[Consultant Security Holder signature Page Follows]

[Signature Page to Stockholders' Agreement]

_Janet P. Graf_

Janet P. Graf

[Signature Page to Stockholders' Agreement]

<u>**EXHIBIT A**</u>
<u>**to Stockholders' Agreement**</u>

<u>**Listed Security Holders**</u>

*<u>Abbreviations</u>*

| **Name and Notice Address(es)<br>Of<br>Listed Security Holder** |
| --- |
| |

A-1

# EXHIBIT B

## SECURED PROMISSORY NOTE
## WITH COGNOVIT PROVISION



**COPY**

$6,500,000.00

Columbus, Ohio
February 24, 2005

FOR VALUE RECEIVED, the undersigned, **Taylor Lumber, Inc.**, an Ohio corporation, having an address of 18253 SR 73, McDermott, Ohio 45652 ("Taylor"), promises to pay to the order of **Robert E. Graf**, having an address of 750 64th Avenue, St. Petersburg, Florida 33706 ("Graf"), at such place as Graf may designate, the sum of SIX MILLION FIVE HUNDRED THOUSAND DOLLARS ($6,500,000.00) (hereinafter called the "Principal Sum"), together with interest thereon as hereinafter provided. Taylor promises to pay the Principal Sum and the interest thereon at the times and in the manner hereinafter provided.

### Terms of Note:

## ARTICLE 1. TERMS AND CONDITIONS.

1.1 <u>Interest</u>. Commencing on February 24, 2005, interest ("Interest") shall accrue on the unpaid balance of the Principal Sum until paid at the annual interest rate (the "Annual Interest Rate") equal to the one year London Interbank Offered Rate ("LIBOR") plus 1.9% on the Interest Rate Reset Date (as defined below) as published in The Wall Street Journal. All interest shall be calculated on the basis of a 365/366 day year for the actual number of days the Principal Sum or any part thereof remains unpaid. The Annual Interest Rate shall be reset each year (a "Payment Year") on the anniversary date of this Note (the "Interest Rate Reset Date"). Graf shall provide Taylor with an amortization schedule each Payment Year.

1.2 <u>Payment of Principal and Interest</u>. The Principal Sum and all accrued and unpaid Interest shall be due and payable in full on April 1, 2012, and monthly installment payments shall be based on a 25 year amortization schedule. The first monthly installment shall be due on April 1, 2005. The monthly installment payment of Principal and Interest for the first Payment Year shall be $38,797.86. The due date of each monthly installment shall be the 1st day of each month. If any day for payment is not a business day, payment shall be made on the next following business day.

1.3 <u>Prepayment</u>. This Note may be prepaid in whole or in part at any time and from time to time without any prepayment fee or penalty. Any amount prepaid under this Note shall be applied first to late charges due hereunder; then to pay, or reimburse Graf for any costs and expenses for which Taylor is liable or which have been incurred by Graf under this Note; then to accrued interest hereunder; and the remainder to reduce the principal balance hereof.

1.4 <u>Late Charge</u>. Any installment or other payment not made within ten (10) days of the date such payment or installment is due shall be subject to a late charge equal to five percent (5%) of the amount of the installment.

1.5 <u>Default</u>. Any of the following events constitutes a default under this Note (each, an "Event of Default"):

1

Exhibit B

(a)     If Taylor fails to pay any installment within thirty (30) days after receipt of the notice from Graf of such non-payment;

(b)     If Taylor fails to pay two (2) consecutive installments on their respective due dates with notice of default having been received under Section 1.5(a) with respect to the first installment;

(c)     If Taylor fails to pay three (3) or more installments in a Payment Year within ten (10) days of their respective due dates and, with respect to the second late installment, within thirty (30) days after receipt of the notice from Graf of such late installment within the Payment Year;

(d)     If Taylor fails to perform any other obligation under this Note within thirty (30) days after receipt of the notice from Graf of such non-performance;

(e)     An Event of Default pursuant to the Mortgage Promissory Note in the amount of $2,500,000.00 from Thomas Graf, Charles Graf, Stephen Sesser, Joseph Churak, Michael Gurley and Ray L. Lute, II (collectively "Borrower"), to Graf (the "Mortgage Note");

(f)     An Event of Default pursuant to the Additional Promissory Note in the amount of $500,000.00 from Taylor to Graf (the "Additional Promissory Note");

(g)     If Taylor fails to perform any obligation under the Redemption Agreement, dated as of February 24, 2005, by and between Taylor and Graf (the "Redemption Agreement"), the Security Agreement, dated as of February 24, 2005, by and between Taylor and Graf (the "Security Agreement") or the Stock Pledge Agreement, dated as of February 24, 2005, by and between Taylor and Graf (the "Stock Pledge Agreement") within thirty (30) days after receipt of the notice from Graf of such non-performance; or

(h)     If Taylor Lumber Industries, Inc. ("Taylor Industries") fails to perform any obligation under the Subordinated Mortgage from Taylor Industries to Graf, dated as of February 24, 2005 (the "Subordinated Mortgage") within thirty (30) days after receipt of the notice from Graf of such non-performance.

Upon an Event of Default, Graf may, at his option, without further notice or demand, accelerate the maturity of the obligations evidenced hereby, which obligations shall become immediately due and payable.  In the event Graf shall institute any action for the enforcement or collection of the obligations evidenced hereby, Taylor agrees to pay all costs and expenses of such action, including reasonable attorneys' fees, to the extent permitted by law.  Upon the occurrence of an Event of Default, whether by acceleration or otherwise, interest will accrue on the unpaid balance of the Principal Sum and accrued unpaid interest, if any, until paid at the rate of one percent (1%) per month.

2

ARTICLE 2.  SECURITY.  The following property described in this Article 2 shall be referred to as "Collateral"):

   2.1   Pledge from Taylor.  To secure payment of this Note, Taylor pledges to Graf, a security interest in the following property:

      (a)   All accounts receivable, inventory, equipment, marketable securities and intangible assets of Taylor subordinated to the lien of National City Bank and its successors and assigns (the "First Priority Lender"), as evidenced in the Security Agreement; and

      (b)   The shares of stock redeemed by Taylor pursuant to the Redemption Agreement, as further described in the Stock Pledge Agreement.

   2.2   Pledge from Taylor Industries.  To secure payment of this Note, Taylor Industries, as guarantor of this Note, pledges to Graf, a security interest in the following property:

      (a)   All accounts receivable inventory, equipment, marketable securities and intangible assets of Taylor Industries, as evidenced in the Security Agreement from Taylor Industries to Graf (the "Taylor Industries Security Agreement"); and

      (b)   All the real property owned by Taylor Industries, as evidenced in the Subordinated Mortgage subordinated to the Mortgage from Taylor Industries to Graf securing the Mortgage Note and subordinated to the Mortgage from Taylor Industries to the First Priority Lender.

   2.3   Pledge from shareholders of Taylor Industries.  To secure payment of this Note, each Borrower pledges the shares of stock purchased from Graf pursuant to that certain stock purchase agreement, dated February 24, 2005, by and between Borrower and Graf, (the "Stock Purchase Agreement"), as further described in each Stock Pledge Agreement dated February 24, 2005 from each Borrower to Graf (each, a "Shareholder Stock Pledge Agreement").

ARTICLE 3.  INCORPORATION OF TERMS OF REDEMPTION AGREEMENT.  The terms of the Redemption Agreement are incorporated into this Note by reference to the same effect as if set forth in this Note in their entirety.  On default under the Redemption Agreement, this Note the Stock Pledge Agreement or the Security Agreement, Graf may exercise any of the remedies granted by the redemption agreement or given to a secured party under the Ohio Uniform Commercial Code.

ARTICLE 4.  GENERAL PROVISIONS.

   4.1   Due on Sale.  Upon the sale or change of control of Taylor or Taylor Industries or sale of all or substantially all of the assets of Taylor or Taylor Industries, this Note shall become immediately due and payable to Graf.

   4.2   Waivers.  The parties hereto, including Taylor, hereby waive presentment, notice of dishonor, protest, notice of protest, and diligence in bringing suit against either party hereto,

702559.5.108476.0016

and consent that, without discharging either of them, the time of payment may be extended an unlimited number of times before or after maturity without notice.

4.3 <u>Substitution, Renewal, Extension</u>. The obligations evidenced hereby may from time to time be evidenced by another note or notes given in substitution, renewal or extension hereof.

4.4 <u>Miscellaneous</u>. The captions used herein are for reference only and shall not be deemed a part of this Note. If any of the terms or provisions of this Note shall be deemed unenforceable, the enforceability of the remaining terms and provisions shall not be affected. This Note shall be governed by and construed in accordance with the law of the State of Ohio.

4.5 <u>Traditional Rule of Construction Not Applicable</u>. In negotiating this Note, Graf and Taylor acknowledge that they each (i) had sufficient time to consider all provisions of, and alternatives to, this Note, (ii) were advised to seek assistance of counsel of their own choice, and (iii) are fully prepared and willing to sign and be legally bound by this Note. Therefore, Graf and Taylor agree that the traditional rules calling for a document to be construed against its draftsman shall not apply.

4.6 <u>Notice</u>. Any notice, request or other communications required or permitted hereunder shall be in writing and shall be deemed to have been received by the other party (a) when received if personally delivered, (b) within five days after being sent by registered or certified mail, return receipt requested, postage prepaid, or (c) within one business day of being sent by overnight courier.

4.7 <u>WAIVER OF RIGHT TO TRIAL BY JURY</u>. TAYLOR ACKNOWLEDGES THAT, AS TO ANY AND ALL DISPUTES THAT MAY ARISE BETWEEN TAYLOR AND GRAF, THE COMMERCIAL NATURE OF THE TRANSACTION OUT OF WHICH THIS NOTE ARISES WOULD MAKE ANY SUCH DISPUTE UNSUITABLE FOR TRIAL BY JURY. ACCORDINGLY, TAYLOR HEREBY WAIVES ANY RIGHT TO TRIAL BY JURY AS TO ANY AND ALL DISPUTES THAT MAY ARISE RELATING TO THIS NOTE OR TO ANY OF THE OTHER INSTRUMENTS OR DOCUMENTS EXECUTED IN CONNECTION HEREWITH.

4.8 <u>Warrant of Attorney</u>. Taylor authorizes any attorney at law to appear in any Court of Record in the State of Ohio or in any other state or territory of the United States after the above indebtedness becomes due, whether by acceleration or otherwise, to waive the issuing and service of process, and to confess judgment against Taylor in favor of Graf for the amount then appearing due together with costs of suit, and thereupon to waive all errors and all rights of appeal and stays of execution.

*[Remainder of page intentionally left blank]*

4

702559.5.108476.0016

## WARNING

**BY SIGNING THIS PAPER YOU GIVE UP YOUR RIGHT TO NOTICE AND COURT TRIAL. IF YOU DO NOT PAY ON TIME A COURT JUDGMENT MAY BE TAKEN AGAINST YOU WITHOUT YOUR PRIOR KNOWLEDGE AND THE POWERS OF A COURT CAN BE USED TO COLLECT FROM YOU REGARDLESS OF ANY CLAIMS YOU MAY HAVE AGAINST THE CREDITOR WHETHER FOR RETURNED GOODS, FAULTY GOODS, FAILURE ON HIS PART TO COMPLY WITH THE AGREEMENT, OR ANY OTHER CAUSE.**

**TAYLOR LUMBER, INC.:**

By: _Thomas A. Graf_
Thomas Graf, President

By: _Joseph M Churak_
Joseph Churak, Vice President

Accepted and Agreed:

**Graf:**

_Robert E. Graf_
Robert E. Graf

5

Fixed Rate Payment Calculator                                    Page 1 of 10

| Input | Calculate | Chart | Detail | Exit |

## Payment Schedule

| Event | Date | Payment | Interest | Principal | Balance |
|---|---|---|---|---|---|
| 0 | 02-24-2005 | 4,703.47 | 4,703.47 | 0.00 | 6,500,000.00 |
| 1 | 04-01-2005 | 38,797.86 | 28,220.83 | 10,577.03 | 6,489,422.97 |
| 2 | 05-01-2005 | 38,797.86 | 28,174.91 | 10,622.95 | 6,478,800.02 |
| 3 | 06-01-2005 | 38,797.86 | 28,128.79 | 10,669.07 | 6,468,130.95 |
| 4 | 07-01-2005 | 38,797.86 | 28,082.47 | 10,715.39 | 6,457,415.56 |
| 5 | 08-01-2005 | 38,797.86 | 28,035.95 | 10,761.91 | 6,446,653.65 |
| 6 | 09-01-2005 | 38,797.86 | 27,989.22 | 10,808.64 | 6,435,845.01 |
| 7 | 10-01-2005 | 38,797.86 | 27,942.29 | 10,855.57 | 6,424,989.44 |
| 8 | 11-01-2005 | 38,797.86 | 27,895.16 | 10,902.70 | 6,414,086.74 |
| 9 | 12-01-2005 | 38,797.86 | 27,847.83 | 10,950.03 | 6,403,136.71 |
| Year 2005 Total | | 353,884.21 | 257,020.92 | 96,863.29 | |

| Event | Date | Payment | Interest | Principal | Balance |
|---|---|---|---|---|---|
| 10 | 01-01-2006 | 38,797.86 | 27,800.29 | 10,997.57 | 6,392,139.14 |
| 11 | 02-01-2006 | 38,797.86 | 27,752.54 | 11,045.32 | 6,381,093.82 |
| 12 | 03-01-2006 | 38,797.86 | 27,704.58 | 11,093.28 | 6,370,000.54 |
| 13 | 04-01-2006 | 38,797.86 | 27,656.42 | 11,141.44 | 6,358,859.10 |
| 14 | 05-01-2006 | 38,797.86 | 27,608.05 | 11,189.81 | 6,347,669.29 |
| 15 | 06-01-2006 | 38,797.86 | 27,559.46 | 11,238.40 | 6,336,430.89 |
| 16 | 07-01-2006 | 38,797.86 | 27,510.67 | 11,287.19 | 6,325,143.70 |
| 17 | 08-01-2006 | 38,797.86 | 27,461.67 | 11,336.19 | 6,313,807.51 |
| 18 | 09-01-2006 | 38,797.86 | 27,412.45 | 11,385.41 | 6,302,422.10 |
| 19 | 10-01-2006 | 38,797.86 | 27,363.02 | 11,434.84 | 6,290,987.26 |
| 20 | 11-01-2006 | 38,797.86 | 27,313.37 | 11,484.49 | 6,279,502.77 |
| 21 | 12-01-2006 | 38,797.86 | 27,263.51 | 11,534.35 | 6,267,968.42 |
| Year 2006 Total | | 465,574.32 | 330,406.03 | 135,168.29 | |

| Event | Date | Payment | Interest | Principal | Balance |
|---|---|---|---|---|---|
| 22 | 01-01-2007 | 38,797.86 | 27,213.43 | 11,584.43 | 6,256,383.99 |
| 23 | 02-01-2007 | 38,797.86 | 27,163.13 | 11,634.73 | 6,244,749.26 |
| 24 | 03-01-2007 | 38,797.86 | 27,112.62 | 11,685.24 | 6,233,064.02 |
| 25 | 04-01-2007 | 38,797.86 | 27,061.89 | 11,735.97 | 6,221,328.05 |
| 26 | 05-01-2007 | 38,797.86 | 27,010.93 | 11,786.93 | 6,209,541.12 |
| 27 | 06-01-2007 | 38,797.86 | 26,959.76 | 11,838.10 | 6,197,703.02 |
| 28 | 07-01-2007 | 38,797.86 | 26,908.36 | 11,889.50 | 6,185,813.52 |

Fixed Rate Payment Calculator

| 29 | 08-01-2007 | 38,797.86 | 26,856.74 | 11,941.12 | 6,173,872.40 |
| 30 | 09-01-2007 | 38,797.86 | 26,804.90 | 11,992.96 | 6,161,879.44 |
| 31 | 10-01-2007 | 38,797.86 | 26,752.83 | 12,045.03 | 6,149,834.41 |
| 32 | 11-01-2007 | 38,797.86 | 26,700.53 | 12,097.33 | 6,137,737.08 |
| 33 | 12-01-2007 | 38,797.86 | 26,648.01 | 12,149.85 | 6,125,587.23 |
| Year 2007 Total | | 465,574.32 | 323,193.13 | 142,381.19 | |

| Event | Date | Payment | Interest | Principal | Balance |
|---|---|---|---|---|---|
| 34 | 01-01-2008 | 38,797.86 | 26,595.26 | 12,202.60 | 6,113,384.63 |
| 35 | 02-01-2008 | 38,797.86 | 26,542.28 | 12,255.58 | 6,101,129.05 |
| 36 | 03-01-2008 | 38,797.86 | 26,489.07 | 12,308.79 | 6,088,820.26 |
| 37 | 04-01-2008 | 38,797.86 | 26,435.63 | 12,362.23 | 6,076,458.03 |
| 38 | 05-01-2008 | 38,797.86 | 26,381.96 | 12,415.90 | 6,064,042.13 |
| 39 | 06-01-2008 | 38,797.86 | 26,328.05 | 12,469.81 | 6,051,572.32 |
| 40 | 07-01-2008 | 38,797.86 | 26,273.91 | 12,523.95 | 6,039,048.37 |
| 41 | 08-01-2008 | 38,797.86 | 26,219.54 | 12,578.32 | 6,026,470.05 |
| 42 | 09-01-2008 | 38,797.86 | 26,164.92 | 12,632.94 | 6,013,837.11 |
| 43 | 10-01-2008 | 38,797.86 | 26,110.08 | 12,687.78 | 6,001,149.33 |
| 44 | 11-01-2008 | 38,797.86 | 26,054.99 | 12,742.87 | 5,988,406.46 |
| 45 | 12-01-2008 | 38,797.86 | 25,999.66 | 12,798.20 | 5,975,608.26 |
| Year 2008 Total | | 465,574.32 | 315,595.35 | 149,976.97 | |

| Event | Date | Payment | Interest | Principal | Balance |
|---|---|---|---|---|---|
| 46 | 01-01-2009 | 38,797.86 | 25,944.10 | 12,853.76 | 5,962,754.50 |
| 47 | 02-01-2009 | 38,797.86 | 25,888.29 | 12,909.57 | 5,949,844.93 |
| 48 | 03-01-2009 | 38,797.86 | 25,832.24 | 12,965.62 | 5,936,879.31 |
| 49 | 04-01-2009 | 38,797.86 | 25,775.95 | 13,021.91 | 5,923,857.40 |
| 50 | 05-01-2009 | 38,797.86 | 25,719.41 | 13,078.45 | 5,910,778.95 |
| 51 | 06-01-2009 | 38,797.86 | 25,662.63 | 13,135.23 | 5,897,643.72 |
| 52 | 07-01-2009 | 38,797.86 | 25,605.60 | 13,192.26 | 5,884,451.46 |
| 53 | 08-01-2009 | 38,797.86 | 25,548.33 | 13,249.53 | 5,871,201.93 |
| 54 | 09-01-2009 | 38,797.86 | 25,490.80 | 13,307.06 | 5,857,894.87 |
| 55 | 10-01-2009 | 38,797.86 | 25,433.03 | 13,364.83 | 5,844,530.04 |
| 56 | 11-01-2009 | 38,797.86 | 25,375.00 | 13,422.86 | 5,831,107.18 |
| 57 | 12-01-2009 | 38,797.86 | 25,316.72 | 13,481.14 | 5,817,626.04 |
| Year 2009 Total | | 465,574.32 | 307,692.10 | 157,982.22 | |

| Event | Date | Payment | Interest | Principal | Balance |
|---|---|---|---|---|---|
| 58 | 01-01-2010 | 38,797.86 | 25,258.19 | 13,539.67 | 5,804,086.37 |

# EXHIBIT C

## ASSIGNMENT OF LOAN AND LOAN DOCUMENTS

FOR VALUE RECEIVED, the receipt and sufficiency of which are hereby acknowledged, **JANET P. GRAF** (as heir to Robert E. Graf, "Assignor"), does hereby assign, transfer and set over, to **TAYLOR LUMBER HOLDINGS, INC.**, a Delaware corporation ("Assignee"), all of Assignor's right, title and interest in and to:

(a)  that certain Secured Promissory Note with Cognovit Provision, dated February 24, 20005, executed by Taylor Lumber, Inc., an Ohio corporation ("Borrower") in favor of Assignor in the original principal amount of $6,500,000 (the "$6,500,000 Note");

(b)  that certain Secured Promissory Note with Cognovit Provision, dated February 24, 2005, executed by Borrower in favor of Assignor in the original principal amount of $500,000 (the "$500,000 Note" and together with the $6,500,000 Note, the "Notes");

(c)  the debt and claims evidenced by the Notes;

(d)  any and all instruments executed in favor of Assignor as security for the Notes, including, without limitation:

(i)  that certain Guaranty Agreement by Taylor Lumber Industries, Inc. ("Taylor Industries"), dated February 24, 2005, for the benefit of Assignee;

(ii)  that certain Security Agreement, dated February 24, 2005, by Borrower for the benefit of Assignee;

(iii)  that certain Security Agreement, dated February 24, 2005, by Taylor Industries for the benefit of Assignee;

(iv)  that certain Subordinated Mortgage of Real Property, dated February 24, 2005, by Taylor Industries, Inc. in favor of Assignee, of record in Volume 1103, Page 659 of the Scioto County, Ohio Recorder's Office;

(v)  that certain Assignment of Rents and Leases, dated February 24, 2005, by Taylor Industries, Inc. to Assignee, of record in Volume 1103, Page 617 of the Scioto County, Ohio Recorder's Office;

(vi)  that certain Stock Pledge Agreement, dated February 24, 2005, by Borrower to Assignee;

(vii)  that certain Stock Pledge Agreement, dated February 24, 2005, by Ray L. Lute II to Assignee;

(viii)  that certain Stock Pledge Agreement, dated February 24, 2005, by Michael Gurley to Assignee;

(ix)  that certain Stock Pledge Agreement, dated February 24, 2005, by Charles Graf to Assignee;

(x)    that certain Stock Pledge Agreement, dated February 24, 2005, by Joseph Churak to Assignee;

(xi)    that certain Stock Pledge Agreement, dated February 24, 2005, by Stephen Sesser to Assignee; and

(xii)    that certain Stock Pledge Agreement, dated February 24, 2005, by Thomas Graf to Assignee;

(c)    any and all financing statements in favor of Assignor as security for the Notes, including, without limitation:

(i)    Financing Statement No. OH00142273432 filed May 17, 2010 by Janet P. Graf as Secured Party and Borrower as Debtor; and

(ii)    Financing Statement No. OH00142273543 filed May 17, 2010 by Janet P. Graf as Secured Party and Taylor Lumber Industries, Inc. as Debtor.

(f)    all other documents executed and/or provided to Assignor by the Borrowers in conjunction with the Notes and each of the other foregoing documents (collectively, the "Loan Documents").

IN CONSIDERATION OF THE ASSIGNMENT AND TRANSFER SET FORTH HEREIN, Assignee hereby purchases and assumes from Assignor all of Assignor's rights and obligations under the Loan Documents assigned hereunder. Accordingly, on and after the date hereof, Assignee shall for all purposes be the lender, payee, grantee, assignee, as the case may be, under the Loan Documents assigned hereunder and shall have all the rights and obligations of the lender, payee, grantee, assignee, as the case may be, thereunder to the same extent as if it were an original party thereto, and Assignor shall be released from all of its obligations and liabilities under the Loan Documents assigned hereunder.

Assignor hereby represents and warrants to Assignee that (i) it is the legal and beneficial owner of the interests being assigned by it hereunder; (ii) no obligor thereunder has any right of setoff against amounts due under the Notes; (iii) Assignor is the sole owner of the Notes, free and clear of all liens, pledges and encumbrances and no third party has any rights or interests in the Notes or any collateral or security therefor; and (iv) the execution and delivery of this Assignment by Assignor is duly authorized. **IT IS UNDERSTOOD AND AGREED THAT ASSIGNOR MAKES NO OTHER REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, OF ANY KIND TO ASSIGNEE.**

Assignee hereby (i) confirms that Assignee has received a copy of the Notes and other Loan Documents assigned hereunder, together with such other documents and information as Assignee has deemed appropriate to make Assignee's decision to enter into this Assignment, (ii) agrees that Assignee will, independently and without reliance upon Assignor and based on such documents and information as Assignee shall deem appropriate at the time, continue to make Assignee's own credit decisions in taking or not taking action under the Loan Documents assigned hereunder, and (iii) confirms that the execution and delivery of this Assignment by Assignee is duly authorized.

This Assignment may be executed in any number of counterparts, all of which taken together shall constitute one agreement, and any of the parties hereto may execute this Assignment by signing any such counterpart.

This Assignment shall be governed by and construed in accordance with the laws of the State of Ohio, excluding its conflicts of laws and choice of laws rules.

This Assignment, along with the Subscription Agreement dated the date hereof executed by Assignee and accepted by Assignor, constitutes the entire agreement between the parties with respect to the subject matter hereof and may be amended or superseded only by a writing executed by the parties.

[Remainder of Page Left Intentionally Blank]

IN WITNESS WHEREOF, the undersigned have executed this Assignment of Loan and Loan Documents as of June **30**, 2010.

ASSIGNOR:

Janet P. Graf

ASSIGNEE:

**TAYLOR LUMBER HOLDINGS, INC.**

By:_____

    Name: Ronald J. Cozean
    Title:   President

IN WITNESS WHEREOF, the undersigned have executed this Assignment of Loan and Loan Documents as of ___June 30___ , 2010.

**ASSIGNOR:**

_____

Janet P. Graf

**ASSIGNEE:**

**TAYLOR LUMBER HOLDINGS, INC.**

By: _____

    Name:  Ronald J. Cozean

    Title:  President

# EXHIBIT D

## CONSULTING AGREEMENT

**THIS CONSULTING AGREEMENT** (this "Agreement") is made and entered into as of this 30th day of June, 2010 (the "Effective Date") by and between **TAYLOR LUMBER ACQUISITION, INC.**, a Delaware corporation (the "Company"), and **JANET P. GRAF**, an individual ("Consultant").

1.    <u>Engagement and Term</u>.  Consultant is hereby retained as a consultant to provide services to the Company as more fully described in Section 3 hereof.  The term of Consultant's engagement hereunder shall commence on the Effective Date and shall continue, unless sooner terminated in accordance with this Agreement, through the earlier of date that Consultant ceases to be a stockholder in the Company, the dissolution of the Company or Consultant's voluntary resignation (the "Consulting Period").

2.    <u>Independent Contractor Status</u>.  Consultant acknowledges and agrees that she is an independent contractor and not an employee, member, partner or joint venturer of Company.  Consultant acknowledges and agrees that, in her capacity as Consultant, she has no authority to legally bind Company and shall not enter into any agreement or other commitment on behalf of Company without the prior authorization of Company.

3.    <u>Services</u>.  During the Consulting Period, Consultant agrees to use reasonable efforts to provide professional services relating to the strategic, operational and financial objectives of the Company.  The parties acknowledge that Consultant shall be free to render similar services to others and to engage in other businesses or render services of any kind to any other corporation, firm, individual or association so long as such services do not violate any non-competition or similar agreement with the Company.  Consultant shall devote such time to the performance of the duties under this Agreement as is reasonably necessary for satisfactory performance thereof.

4.    <u>Compensation</u>.  As compensation for Consultant's services hereunder, the Company shall pay Consultant as follows:

4.1.    <u>Consulting Fees</u>.  Company shall pay Consultant for services rendered pursuant hereto at the annual rate of One Hundred Eighty Thousand Dollars ($180,000) ("Consulting Fee").  The Consulting Fee shall be payable monthly in advance, subject to adjustment as provided below, by wire transfer in immediately available funds (each such monthly payment is hereinafter referred to as the ("Monthly Fee"), on the date hereof, with respect to the first such monthly payment and, thereafter, the first business day of each succeeding month.  If the date of this Agreement does not coincide with the beginning of a calendar month, then the Company will pay a prorated amount from such date to the end of the current month.  The Consulting Fee (and any monthly payment) shall increase or decrease during the term of this Agreement at such time as the advisory fee (the "Advisory Fee") being paid by the Company or its affiliates to Resilience Management, Inc. ("RMI") pursuant to that certain Advisory Agreement between Taylor Lumber Holdings, Inc. and RMI (the "Advisory Agreement") is increased or decreased such that at all times the amount of the Consulting Fee is equal to fifty-six and one quarter percent (56.25%) of the amount of the Advisory Fee being paid to RMI.  Notwithstanding the foregoing, the Consulting Fee shall not be subject to increase if the Advisory Fee is increased or supplemented by reason of any acquisition, merger, joint venture or other strategic transaction by the Company or any of its

1834637.7

Exhibit D

subsidiaries or if RMI is obligated to provide services beyond the scope of services provided under the current Advisory Agreement. Notwithstanding anything to the contrary contained herein, in the event that any of the Monthly Fees are not paid to the Consultant as required herein for any reason, then the Company shall pay any such delinquent Monthly Fees in full as soon as possible thereafter, together with interest at a rate of 8% per annum (accruing from the applicable due date of any such deferred payment and compounded monthly).  ☞ )4 ʃoϑ

    4.2.   <u>Reimbursement of Expenses</u>.  Client agrees to pay Consultant reasonable out-of-pocket expenses incurred in connection with the services to be performed hereunder (such as travel costs, communication costs, etc.) within ten (10) days of the date of the applicable invoice. ~~All costs must be approved by the Company before incurred.~~

    5.   <u>Termination</u>.

    5.1.   Company may terminate this Agreement for Cause.  "Cause" shall mean any fraud, misappropriation or embezzlement by Consultant in connection with the business of the Company or any of its subsidiaries, or the commission of any intentional tort by Consultant against the Company or any of its subsidiaries.

    5.2.   Consultant may terminate this Agreement upon thirty (30) days' notice.

    6.   <u>Subordination</u>.  Consultant hereby subordinates all claims in connection with the Consulting Fee to any and all indebtedness now owed or hereafter incurred by the Company, Taylor Lumber Holdings, Inc. or their subsidiaries to its primary senior lender ("Senior Lender") which provides, on a secured or unsecured basis, the Company's primary working capital financing facility (the "Senior Debt").  Consultant agrees that except as provided below, all payments then due and owing under the Senior Debt of the Company to Senior Lender shall be paid in full before any payment may be made on the obligations of the Company to the Consultant under this Agreement.  Notwithstanding the foregoing, so long as there shall be no event of default under any of the documents evidencing the Senior Debt ("Senior Debt Default"), and such payment would not cause a Senior Debt Default to occur, the Company may pay and Consultant may receive the scheduled payments of the Consulting Fee, as and when the sums are due and payable as set forth in this Agreement.  The Company shall have the right to defer any Consulting Fee payment due hereunder if a Senior Debt Default is outstanding or such payment would cause a Senior Debt Default to occur; and such payments shall continue to be deferred without penalty until the Senior Debt Default is cured (as evidenced by written notice from the Senior Lender) or the Company is in a position to make such payment without causing a Senior Debt Default to occur.  Upon the request of Senior Lender, Consultant shall execute and deliver to Senior Lender a Subordination Agreement in form and content reasonably acceptable to Senior Lender; provided, however, that, under no circumstances shall any Subordination Agreement provide that Consultant receive less than fifty-six and one quarter percent (56.25%) of the Advisory Fee being received by RMI at any time. Notwithstanding anything to the contrary contained herein, should the Company be unable to pay in full both the Consulting Fee and the Advisory Fee when such payments are due, payments under this Agreement and the Advisory Agreement shall be made on a pro rata basis to the extent of funds available to be distributed to the Consultant and RMI.

7.    <u>Restrictive Covenants</u>.

7.1    <u>Certain Definitions</u>.  For the purposes of this Section 7:

(a)    "<u>Confidential Information</u>" means such information of the Company, including but not limited to, technical or non-technical data, formulae, patterns, compilations, programs, devices, methods, techniques, drawings, processes, production costs, selling prices, cost of materials used, financial data or lists of actual or potential customers or suppliers, that (i) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use and (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality or otherwise identified and treated by the Company as confidential

(b)    "<u>Restricted Period</u>" shall mean the Consulting Period under this Agreement and the five (5) year period immediately following the expiration or termination of the Consulting Period.

(c)    "<u>Restricted Business</u>" shall mean any business involving the development, manufacture, sale or supply of products and services which are the same as, or substantially similar to, products and services developed, manufactured, sold or supplied by the Company, including any such products or services which is in the process of development, at any time during the Term.

(d)    For purposes of this Section 7, the term "Company" shall be deemed to include all subsidiaries and affiliates of the Company.

7.2    <u>Non-Competition</u>.  Except with the prior written consent of the Company, Consultant shall not, during the Restricted Period, in any capacity whatsoever and whether on Consultant's own account or in connection or cooperation with any other person or entity, directly or indirectly, whether as owner, partner, shareholder, advisor, consultant, agent, employee, co-venturer, creditor, officer, director, or trustee, lend the Consultant's name or credit to, or render services or advice to, or otherwise engage, participate, assist or invest in any Restricted Business, provided that, the foregoing shall not restrict the Consultant from holding not more than five percent (5%) of the equity securities of a publicly held enterprise so long as Consultant does not render advice or assistance to such enterprise.

7.3    <u>Non-Solicitation</u>.  Except with the prior written consent of the Company, Consultant shall not during the Restricted Period (in any capacity whatsoever and whether on his own account or in conjunction with any other person or entity) (i) solicit clients, customers or suppliers of the Company, or accept business from any such clients, customers or suppliers; or (ii) employ or endeavor to entice away from the Company any person who (is at the date of termination of Consultant) an employee or subcontractor employed by the Company and Consultant shall not discourage any such employee or subcontractor from continuing to be employed by the Company.

7.4    <u>Work-For-Hire and Assignment of Rights</u>.  Except with the prior written consent of the Company, Consultant shall have no right, title or interest in and to any writing, works of authorship, intellectual property or invention created by Consultant (each, an "Invention" and

3

collectively, the "Inventions") during the Consultant's engagement with the Company. Each Invention will belong exclusive to the Company. Consultant acknowledges that each of the Inventions is a work made for hire and the property of the Company, including any copyrights, patents, or other intellectual property rights pertaining thereto. Except to the extent any rights in the Inventions constitute works made for hire under the U.S. Copyright Act, 17 U.S.C. Section 101 et seq., the Consultant hereby assigns to the Company all of the Consultant's right, title and interest, including all rights of copyright, patent, and other intellectual property rights. to or in such Inventions. Consultant covenants that she will promptly: (i) disclose to the Company in writing any Invention; (ii) assign to the Company or to a party designated by the Company, at the Company's request and without additional compensation, all of the Consultant's right to the Invention for the United States and all foreign jurisdictions; (iii) execute and deliver to the Company such applications, assignments and other documents as the Company may request in order to apply for and obtain patents or other registrations with respect to any Invention in the United States and any foreign jurisdictions; (iv) sign all other papers necessary to carry out the above obligations; and (v) give testimony and render any other assistance, in support of the Company's rights to any Invention. Consultant acknowledges and agrees that she has no whole or partial ownership interest in any invention or other intellectual property right that is an Invention.  If the Company is unable for any reason, after reasonable effort, to obtain Consultant's signature on any document needed in connection with the actions described in this Section 6.4, the Consultant hereby irrevocably designates and appoints the Company and its duly authorized officers and agents as the Consultant's agent and attorney-in-fact to act for and in the Consultant's behalf to execute, verify, and file any such documents and do all other lawfully permitted acts to further the purposes of this section with the same legal force and effect as if executed by the Consultant.

       7.5   <u>Nondisclosure</u>.  Consultant recognizes and acknowledges that each item of Confidential Information, as the same may exist from time to time, is a valuable, special and unique asset of the business of the Company.  At all times, both during the Consultant's engagement with the Company and after the expiration or termination of the Consulting Period, Consultant shall not disclose any Confidential Information to any person or entity other than employees of the Company, for any reason whatsoever, other than as may be in furtherance of the Company's business, nor shall Consultant use any Confidential Information for her own benefit or personal gain.

       7.6   <u>Reasonableness of Restrictions</u>.  Consultant acknowledges and agrees that the covenants contained in this Section 7 herein are separate, severable and enforceable and that the restrictions contained in such covenants are fair and reasonable in the context of this Agreement. The parties hereto acknowledge, however, that such restrictions are liable to be rendered invalid by changing circumstances or other unforeseen reasons and accordingly: (i) if any one or more of the restrictions contained in this Section 7 shall either individually or together be adjudged, for whatever reason, to go beyond that which is reasonable in all the circumstances for the protection of the legitimate interests of the Company but would be adjudged reasonable if any particular restriction or restrictions were deleted or limited in any manner (including, without prejudice to the generality of the foregoing, any reduction in duration or geographical area) such restrictions shall apply with such deletions or limitations; or (ii) if at any other time for whatever reason the Company shall consider it to be in its best interests it shall be entitled, at its discretion, by notice in writing to Consultant to delete or limit in any manner any of the restrictions contained in this Section 7 and in such event such restrictions shall apply with such deletions or limitations.

7.7 <u>Remedies</u>. Consultant specifically acknowledges and agrees that the remedy at law for any breach of the provisions of this Section 7 will be inadequate and that the Company, in addition to any other relief available to it, shall be entitled to such temporary and permanent injunctive relief as any court of competent jurisdiction may determine appropriate under the circumstances. For purposes of the foregoing, Consultant acknowledges that the Company shall not be required to prove actual damages as a condition to any such injunctive relief so long as the Company can demonstrate a reasonable likelihood of damage arising out of Consultant's breach (or threatened breach) of the provisions of this Section 7.

8. <u>Miscellaneous</u>.

8.1. <u>Severability</u>.  All provisions of this Agreement are intended to be severable. In the event any provision or restriction contained herein is held to be invalid or unenforceable in any respect, in whole or in part, such finding shall in no way affect the legality, validity or enforceability of all other provisions of this Agreement. The parties hereto further agree that any such unenforceable provision or restriction shall be deemed modified so that it shall be enforced to the greatest extent permissible under law, and to the extent that any court of competent jurisdiction determines any restriction herein to be overly broad or unenforceable, such court is hereby empowered and authorized to limit such restriction that it is enforceable to the fullest extent permissible under applicable law.

8.2. <u>Binding Effect.</u>  This Agreement shall bind the Company and Consultant and shall inure to the benefit of Company and Consultant and their respective successors and assigns; provided, however, that Consultant shall not have the right to assign this Agreement to any third party without the prior written consent of the Company.

8.3. <u>Entire Agreement</u>.  This Agreement contains the entire understanding between the Company and Consultant relating to the subject matter of this Agreement, and supersedes any prior agreement or understanding with regard to the subject matter hereof. This Agreement may be amended only in a writing signed by the party against whom enforcement is sought.

8.4. <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the local laws of the State of Ohio without regard to conflicts of law principles. The parties consent to the jurisdiction of any federal or state court in the State of Ohio for purposes of any action arising under this Agreement.

**[Remainder of Page Intentionally Left Blank]**

The parties have executed this Agreement as of the date first written above to evidence their mutual intent to be legally bound by its terms.

**TAYLOR LUMBER ACQUISITION, INC.,**
a Delaware corporation

By: _____
     Name: Ronald J. Cozean
     Its: President

_____
**JANET P. GRAF**, an individual

Resilience Management, Inc. executes this Agreement for the purposes of acknowledging and agreeing to be bound by the provisions of Section 6 of this Agreement.

**RESILIENCE MANAGEMENT, INC.,**
an Ohio corporation

By:_____
     Name:  Bassem A. Mansour
     Its:     Co-Chief Executive Officer

**[Signature Page to Consulting Agreement]**

The parties have executed this Agreement as of the date first written above to evidence their mutual intent to be legally bound by its terms.

**TAYLOR LUMBER ACQUISITION, INC.,**
a Delaware corporation

By:_____
Name: _____
Its: _____

**JANET P. GRAF**, an individual

Resilience Management, Inc. executes this Agreement for the purposes of acknowledging and agreeing to be bound by the provisions of Section 6 of this Agreement.

**RESILIENCE MANAGEMENT, INC.,**
an Ohio corporation

By: _____
Its: _____

**[Signature Page to Consulting Agreement]**

The parties have executed this Agreement as of the date first written above to evidence their mutual intent to be legally bound by its terms.

**TAYLOR LUMBER ACQUISITION, INC.,**
a Delaware corporation

By:_____
    Name: Ronald J. Cozean
    Its: President

_____
**JANET P. GRAF**, an individual

Resilience Management, Inc. executes this Agreement for the purposes of acknowledging and agreeing to be bound by the provisions of Section 6 of this Agreement.

**RESILIENCE MANAGEMENT, INC.,**
an Ohio corporation

By:_____
    Name:  Bassem A. Mansour
    Its:      Co-Chief Executive Officer

**[Signature Page to Consulting Agreement]**

# EXHIBIT E

25101 Chagrin Boulevard, Suite 350
Cleveland, Ohio 44122
Tel: 216.292.0200
Fax: 216.292.4750



# RESILIENCE
## C A P I T A L   P A R T N E R S

January 5, 2012

Janet P. Graf

750 64th Avenue

St. Pete Beach, FL 33706-2110

Dear Jan:

On December 31st, 2011 Taylor Holdings purchased the assets of Weaber Inc., a hardwood lumber producer located in Lebanon, PA. In connection with this acquisition, we invested approximately $18 million to fund the transaction. Of this amount, the company issued new shares totaling $5 million. Per the terms of the Stockholder's Agreement, you have the option to contribute your pro rata share and avoid any dilution. I have included a notice where you can elect which option you choose.

Additionally, I have included a check that represents your outstanding management fee for 2011.

Regards,

Ki Mixon

Principal

Resilience Capital Partners

Exhibit E

# TAYLOR LUMBER HOLDINGS, INC.

c/o Resilience Capital Partners, LLC
25101 Chagrin Boulevard, Suite 350
Cleveland, Ohio 44122

January 5, 2012

Janet P. Graf
750 64th Avenue
St. Pete Beach, FL 33706-2110

### *Re: Anti-Dilution Option*

On December 30, 2011, Taylor Lumber Holdings, Inc., a Delaware corporation (the *"Company"*), issued (i) 84,903,300 shares of its Class A Voting Common Stock, par value $0.001 per share (*"Common Stock"*), and 339,613,200 shares of its non-voting Preferred Stock, par value $0.001 per share (*"Preferred Stock"*) to The Resilience Fund III, L.P., and (ii) 15,096,700 shares of Common Stock and 60,386,800 shares of Preferred Stock to The Resilience Fund III (PF), L.P., in each case at a purchase price of $0.01 per share of Common Stock and $0.01 per share of Preferred Stock for an aggregate purchase price of $5,000,000 (such issuance, the *"Issuance"*).

Reference is made to the Stockholders' Agreement, dated as of June 30, 2010, by and among the Company and its Stockholders (as amended to date, the *"Stockholders' Agreement"*). Capitalized terms used and not otherwise defined herein shall have the meanings given to them in the Stockholders' Agreement.

Pursuant to Section 9.1 of the Stockholders' Agreement, as a party to the Stockholders' ~~315 k~~ Agreement, you are entitled to purchase approximately 31,512,857.17044 shares of Common Stock for $0.01 per share, and 126,038,928.68175 shares of Preferred Stock for $0.01 per share, ~~1,260,389~~ which is up to the number of Shares equal to your percentage ownership of Shares on a fully diluted bases before such Issuance.

You may only exercise this option by delivering notice of your exercise to the Company within 30 days after this notice is given, together with payment for the Shares being purchased according to the terms set forth herein.

**To evidence your intent relating to your right to purchase Shares under Section 9.1 of the Stockholders' Agreement, please check the appropriate box and sign in the space set forth below. We ask that you return a copy of this letter to the Company, attention Ki Mixon, via facsimile no later than 5:00 p.m. Eastern time on February 4, 2012 with a copy to Melanie Shwab via facsimile at (216) 579-0212.**

Please call Ki Mixon at (216) 292-0503 with any questions you may have regarding this matter.

_____ The undersigned hereby (1) elects to purchase _____ shares of Common Stock at a price of $0.01 per share, and _____ shares of Preferred Stock at a price of $0.01 per share; (2) waives the right to purchase any other shares of Common Stock or Preferred Stock in connection with the Issuance, if any; and (3) tenders payment in the amount of

CLI-1950710v1

$_____, for the Shares being purchased (which amount is the total of (i) the price per share of Common Stock multiplied by the number of Common Stock shares elected, plus (ii) the price per share of Preferred Stock multiplied by the number of Preferred Stock shares elected, if any) with this election.

_____  The undersigned hereby (1) waives the provisions of Section 9.1 of the Stockholders' Agreement, insofar as they relate to the right to purchase any Shares in connection with the Issuance, and (2) releases the Company from any further obligation thereunder with respect thereto.


_____.        Dated: _____, 2012
Janet P. Graf

# EXHIBIT F

# Taft /

Taft Stettinius & Hollister LLP

200 Public Square, Suite 3500 / Cleveland, OH 44114-2302 / Tel: 216.241.2838 / Fax: 216.241.3707 / www.taftlaw.com
Cincinnati / Cleveland / Columbus / Dayton / Indianapolis / Northern Kentucky / Phoenix

HOWARD BOBROW
216.706.3954
hbobrow@taftlaw.com

April 5, 2012

**VIA FACSIMILE (216-292-4750)**

Taylor Lumber Holdings, Inc.
c/o Resilience Capital Partners, LLC
Attention:  Managing Partner
25101 Chagrin Boulevard, Suite 350
Cleveland, Ohio 44122

> Re:   Stockholders' Agreement dated as of June 30, 2010 ("Stockholders'
> Agreement") among Taylor Lumber Holdings, Inc. ("Taylor") and the
> persons listed on Exhibit A thereto.

Ladies and Gentlemen:

As you are aware, we represent Janet Graf in connection with the Anti-Dilution Option dated January 5, 2012, which Anti-Dilution Option was issued pursuant to Section 9.1 of the Stockholders' Agreement.  The purpose of this letter is to outline the basis for Ms. Graf's claims with respect to the Anti-Dilution Option, the process underlying the proposed transaction structure that resulted in the issuance of shares by Taylor, as well as the conduct of your clients, both the Resilience Fund II Annex, L.P. (together with other affiliates of Resilience Capital Partners, LLC, collectively referred to herein as the "Majority Stockholder") and Taylor.  To that end, a brief recitation of our understanding of the facts and circumstances may be helpful.  Capitalized terms used in this letter and not otherwise defined will have the meanings set forth in the Stockholders' Agreement.

On December 30, 2011, Taylor issued shares to The Resilience Fund III, L.P. and The Resilience Fund III (PF), L.P.  According to the Anti-Dilution Option, the per share purchase price was $0.01, and the aggregate purchase price paid for all the shares issued was $5 million.  The Anti-Dilution Option granted Ms. Graf the opportunity to purchase her *pro rata* portion of the issued shares in order to retain her percentage ownership of Taylor on a fully-diluted basis.

These shares were issued by Taylor on December 30, 2011 in order to fund the acquisition by Taylor of Weaber, Inc. ("Weaber").  According to the

Exhibit F

Taylor Lumber Holdings, Inc.
April 5, 2012
Page 2

January 5, 2012 Majority Stockholder's letter sent to Ms. Graf with the Anti-Dilution Option, the Majority Stockholder "invested" approximately $18 million to fund the Weaber acquisition transaction.  Based on the fact that the Anti-Dilution Option permits Ms. Graf to invest her *pro rata* portion of $5 million, we presume that it was the Majority Stockholder's original intention to capitalize Weaber with approximately $13 million of indebtedness, and $5 million of equity.  We understand that the Majority Stockholder has been in discussions with PNC Bank regarding a senior credit facility for Taylor and Weaber, and that the terms of this credit relationship may have been already finalized as of the date of this letter.  Although, as of the deadline for Ms. Graf to respond to the Anti-Dilution Option, the terms of the credit facility had not been finalized or even determined.  To the extent that the terms of the credit facility have been finalized, or the credit agreement entered into, we would appreciate the opportunity to review the loan documents as soon as practicable.

The number of shares issued by Taylor on December 30, 2011, relative to the number of shares previously issued and outstanding, and the nominal price per share of the shares so issued, have caused a severe, unfair, inappropriate, and illegal dilutive effect to Ms. Graf's interest in Taylor.  Issuing so many shares at such a nominal price per share is the functional equivalent of the Majority Stockholder causing Taylor to be valued as worthless.  The Majority Stockholder's asserted worthless valuation of Taylor was affirmed by Mr. Mixon's comments to us during a telephone conference on March 19, 2012.  The worthless valuation of Taylor is unsubstantiated, and a form of self-dealing by the Majority Stockholder.

We dispute the Majority Stockholder's valuation of Taylor as worthless, and challenge the underlying assumptions and processes, if any, upon which the Majority Stockholder based the assertion that Taylor has no value. To our knowledge, the price per share of the December 30, 2011 issuance of shares was made in a completely arbitrary fashion by the Majority Stockholder in order to intentionally dilute the ownership interest of Ms. Graf in the most severe fashion.

Also, to our knowledge, neither the Majority Stockholder nor the Board of Directors of Taylor performed any sort of valuation exercise on Taylor.  In addition, no third party appraisal of Taylor was obtained prior to valuing Taylor as worthless for purposes of the December 30, 2011 issuance of shares.  The worthless valuation applied to Taylor by the Majority Stockholder greatly benefited the Majority Stockholder by increasing the Majority Stockholder's ownership interest at the expense of Ms. Graf's interest.  We believe all of these actions violate the fiduciary duties, and duties of good faith and fair dealing, owed by the Majority Stockholder to Ms. Graf, a minority stockholder.

71965795.2

Taylor Lumber Holdings, Inc.
April 5, 2012
Page 3

Based on the information made available to us thus far, we note the following specific issues:

1.      It is not evident how the Majority Stockholder concluded that the equity value of Taylor decreased from $3,408,000 (before giving effect to the bargain purchase element) as of June 30, 2010, to a nominal value as of December 31, 2011. In fact, it appears that the Majority Stockholder did not even determine Taylor's equity value as of December 31, 2011. If Taylor's equity value as of December 31, 2011 was in fact nominal, it is unclear how the value of Taylor decreased so significantly in the eighteen month period since Taylor had been acquired by the Majority Stockholder. As mentioned above, such a rapid and extreme decrease in value is unsubstantiated.

2.      It is reasonable and appropriate that current and future valuations give consideration to tangible book value / net assets until a valuation of the equity can be supported based on earnings and cash flow. Taylor's earnings and cash flow at the time of its acquisition could not support a positive equity value; however, in that case and at that time the Majority Stockholder purchased Taylor based on the net book value of the acquired assets and Taylor's opening balance sheet provided for net equity value of approximately $3.33 million. Likewise, at the end of 2011 a positive equity value could not be supported based on Taylor's current earnings and cash flow. At that time, however, there was positive tangible net worth.  But then suddenly at the end of 2011 Taylor is deemed worthless? These approaches to valuation are clearly inconsistent.  When the Majority Stockholder bought the company in June 2010, it was valued based on tangible book value / net assets.  At the end of 2011, the Majority Stockholder asserts that Taylor is to be valued based on its earnings and cash flow and therefore has nominal value. It is questionable whether the Majority Stockholder can explain the inconsistent methods of valuation used in June 2010 and December 2011? Obviously, the application of these inconsistent valuation methods inure greatly to the benefit of the Majority Stockholder by diluting Ms. Graf's interest to slightly next-to-nothing and increasing the Majority Stockholder's stake.  If the valuation methodology that was applied in June 2010 were applied to Taylor in December 2011, Taylor's equity value would in fact be significantly greater than a nominal amount.

3.      It is also unclear as to how Taylor has a nominal equity value if its tangible book value was approximately positive $2,851,000 as recently as November 30, 2011, and actually increased over the period June 30, 2010 to November 30, 2011. We acknowledge that subsequent book values reflect the bargain purchase element, but this change defies explanation.  Given the relatively recent nature of the purchase of the net assets of Taylor and the fact that Taylor's balance sheet is audited, it is highly probably that its assets are stated at fair value.

Taylor Lumber Holdings, Inc.
April 5, 2012
Page 4

Unless some unknown materially adverse event occurred during December 2011, this can only suggest that Taylor's equity value is in fact vastly greater than the nominal amount that was arbitrarily assigned to Taylor by the Majority Stockholder.

4.      In addition, Taylor's tangible book value as of July 1, 2011 was reduced by costs and expenses unrelated to Taylor's results of operations, namely, significant management fees and excessive transaction fees. Specifically, management fees totaled $500,000 for the year ending June 30, 2011 and totaled $208,000 for the five months ending November 30, 2011. Transaction fees totaled $985,000 in connection with the June 2010 acquisition of Taylor.  These transaction fees (equal to 10.9% of the total purchase price for Taylor Lumber) appear to be excessive in relation to the aggregate purchase price and in general.  It is unclear from our review of the materials provided whether any portion of the transaction fees were paid to the Majority Stockholder. If Taylor really was worthless, insolvent, or in the "zone of insolvency", it is inappropriate and in violation of the Majority Stockholder's and the Board of Directors' fiduciary duties for Taylor to be paying substantial management fees to a related party.

5.      Given the nominal equity value given to Taylor as of December 31, 2011, it appears that the Majority Stockholder has a negative view about Taylor's financial future, and that the Majority Stockholder believes that Taylor will continue to suffer losses which will ultimately deplete Taylor's reported and tangible net worth. If this is true, the Majority Stockholder has a fiduciary responsibility to all stockholders to protect the equity value of Taylor and to maximize the outcome of the original investment in Taylor for all stockholders, even if this were to mean liquidating the net assets.  The Majority Stockholder's and the Board of Directors' fiduciary responsibilities required that an intermediary be retained to explore all available strategic alternatives, in an effort to maximize stockholder value?  We are not aware that any such alternatives were explored by the Board of Directors, and accordingly the Board of Directors did not properly discharge its obligations under law.

6.      The nominal value attributable to Taylor is not supported by Taylor's reported operating results or the Majority Stockholder's own projections. Specifically, operating results have improved over the last six months with operating cash flow (EBITDA) increasing from negative $231,000 for the six months ending June 30, 2011 to positive $63,000 for the six months ending December 31, 2011.  In addition, plan operating cash flow (EBITDA) for the twelve months ending December 31, 2012 (and 2013/2014 for that matter) is positive $285,000 before taking into consideration any of the savings associated

Taylor Lumber Holdings, Inc.
April 5, 2012
Page 5

with the acquisition of Weaber.  So further contradicting a worthless valuation, EBITDA seems to have been trending in the right direction.

      7.     Given the purported nominal equity value of Taylor as of December 31, 2011, combined with the $3,858,000 pre-tax loss for the year ending July 1, 2011 (before the bargain purchase gain), and notwithstanding the $4,222,000 stockholders' equity and $3,024,000 tangible net worth as of July 1, 2011, Taylor's auditors would have been required to raise doubt as to Taylor's ability to continue as a going concern if Taylor were, as asserted by the Majority Stockholder, actually worthless.  It does not appear that any such concerns were raised by the auditors.

      It necessarily follows that if Taylor had been properly and fairly valued by the Majority Stockholder, Ms. Graf's analysis of whether to exercise her rights pursuant to the Anti-Dilution Option would have been materially different. If the issuance of shares and corresponding valuation of Taylor were to stand as proposed by the Majority Stockholder, Ms. Graf's ownership interest would be reduced from an aggregate of 25% to approximately 0.00312%.  If Taylor were properly valued and Ms. Graf exercised her rights in part, or not at all, then the issuance of new shares on December 30, 2011 would not have resulted in the severe, unfair, inappropriate, and illegal dilutive effect to her ownership interest in Taylor.

      Accordingly, we demand that an independent, third party valuation of Taylor stockholders' equity, considered as a whole, be obtained as of December 30, 2011, so that the shares subject to the Anti-Dilution Option are properly and fairly valued, and Ms. Graf can then evaluate exercising the Anti-Dilution Option under appropriate circumstances.  We further require that an independent, third party intermediary be retained to explore potential strategic alternatives for Taylor in an effort to maximize its value for all its stakeholders.

      If we do not hear from  you by April 20, 2012, we will consider and pursue all available remedies, including litigation.

            Sincerely,

            Howard Bobrow

c:    Julie A. Crocker, Esq.
      Charles W. Hardin, Jr. (via email at charleswhardin@jonesday.com)
      Ki Mixon (via email at kmixon@resiliencecapital.com)